**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re: | Chapter 11 |
| ESCO, Ltd.,[1] | Case No. 23-12237 (DER) |
| Debtor. | |

**DECLARATION OF STANLEY W. MASTIL, CHIEF RESTRUCTURING
OFFICER, IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION
AND FIRST DAY MOTIONS**

I, Stanley W. Mastil, hereby declare under penalty of perjury and to the best of my knowledge, information and belief:

1.      I am a Senior Director in the firm Gavin/Solmonese LLC, and serve as the Chief Restructuring Officer ("**CRO**") of ESCO, Ltd. (the "**Debtor**" or the "**Company**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

2.      In my capacity as CRO of the Debtor, I have developed personal knowledge of, and am familiar with, the business affairs, day-to-day operations, books and records, and financial condition of the Debtor. I am authorized to make this declaration (this "**Declaration**") on behalf of the Debtor. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's employees, agents, attorneys, and advisors, the accuracy and completeness of which information I relied upon to provide this Declaration. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation

---

[1] The Debtor in this Chapter 11 case and the last four digits of its federal tax identification are ESCO, Ltd., DBA Shoe City (5654). The Debtor's principal address is 1800 Woodlawn Drive, Gwynn Oak, Maryland 21207-4007.

provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      On March 31, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the District of Maryland (the "**Court**") commencing a case for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor will continue to operate its business and manage its properties as a debtor in possession.

4.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief that was filed under chapter 11 of the Bankruptcy Code and (b) "first-day" pleadings, which are being filed concurrently herewith (collectively, the "**First Day Pleadings**").[2]

5.      Contemporaneously herewith, the Debtor has filed the following First Day Pleadings:

    a.      Notice of Complex Chapter 11 Case Procedures (the "**Complex Case Notice**")

    b.      Debtor's Motion Pursuant to Bankruptcy Rules 1007(A)(5) and 1007(C) for an Extension of Time to File List of Equity Security Holders, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs (the "**Schedules Extension Motion**");

    c.      Debtor's Motion for Entry of an Order (I) Approving Continued Use of Cash Management System; (II) Authorizing the Debtor to Open and Close Bank Accounts; and (III) Authorizing Banks to Honor Certain Payments (the "**Cash Management Motion**");

    d.      Debtor's Motion for Order (I) Authorizing the Debtor to Pay Prepetition Wages and Compensation, (II) Authorizing the Continuation of Employee Benefit Programs, (III) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations, and (IV) Granting Related Relief (the "**Wages Motion**");

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings.

e.  Debtor's Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service (the "**Utilities Motion**");

f.  Debtor's Motion for an Order Authorizing Payment of Prepetition Taxes and Fees (the "**Taxes Motion**");

g.  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies from Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay, and (IV) Authorizing the Debtor to Continue to Honor Brokerage Obligations (the "**Insurance Motion**");

h.  Debtor's Application for Appointment of Stretto, Inc. as Claims and Noticing Agent *Nunc Pro Tunc* to the Petition Date (the "**Claims Agent Application**");

i.  Debtor's Motion for Entry of an Order Authorizing Maintenance, Administration, and Limited Continuation of Certain Customer Programs (the "**Customer Programs Motion**");

j.  Debtor's Motion for Entry of an Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases (the "**Rejection Procedures Motion**");

k.  Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Assume the Consulting Agreements; (II) Approving Procedures for Store Closing Sales; (III) Approving the Sale of Store Closure Assets Free and Clear of All Liens, Claims and Encumbrances; (IV) Waiving Compliance with Applicable State Laws and Approving Dispute Resolution Procedures; and (V) Granting Related Relief (the "**Store Closing Procedures Motion**");

l.  Debtor's Motion for Entry of an Order Approving Store Level Employee Bonus Plan (the "**Store Level Bonus Motion**");

m.  Debtor's Motion for Entry of Interim and Final Orders (1) Authorizing the Debtor to Obtain Post-Petition Financing, Granting Senior Post-Petition Security Interests and According Superpriority Administrative Expense Status Pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, (2) Authorizing the Use of Cash Collateral, (3) Granting Adequate Protection,

(4) Modifying the Automatic Stay, and (5) Granting Related Relief (the "**DIP Motion**");

n.    Debtor's Application Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code to Retain Gavin/Solmonese LLC to Provide a Chief Restructuring Officer and Certain Additional Personnel for the Debtor *Nunc Pro Tunc* to the Petition Date (the "**CRO Application**");

o.    Debtor's Motion for Entry of an Order (I) Establishing Procedures to Sell Certain Leases; (II) Scheduling a Sale, Assumption, and Assignment Hearing; (III) Authorizing the Sale, Assumption, and Assignment of Leases; and (IV) Granting Related Relief (the "**Lease Sale Motion**").

6.    The Debtor seeks the relief set forth in the First Day Pleadings to minimize any disruption to the business enterprise given the commencement of the Chapter 11 Case and in order to maximize the value of its assets. I have reviewed the Debtor's petition and the First Day Pleadings or have otherwise had their contents explained to me by the Debtor's advisors, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtor's business and to successfully maximize the value of the Debtor's estate.

7.    References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel or from my personal experience in other restructurings. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

8.    To familiarize the Court with the Debtor and the relief the Debtor seeks early in this Chapter 11 Case, this Declaration is organized into four sections. Section I provides an introduction to the Debtor and detailed information on the Debtor's corporate history and business operations. Section II provides an overview of the Debtor's prepetition capital structure. Section III describes the circumstances leading to the commencement of this Chapter 11 Case, the Debtor's efforts to negotiate agreements with key constituents, and the objectives of this Chapter 11 Case. Section IV sets forth the relevant facts in support of each of the First Day Pleadings filed in

connection with this Chapter 11 Case, which the Debtor believes are critical to administering this Chapter 11 Case and preserving and maximizing the value of the Debtor's estate.

## I.    OVERVIEW OF CORPORATE HISTORY AND BUSINESS OPERATIONS

9.    Headquartered in Baltimore, the Company was formed in 1949 as Eileen Shoes. The Company rebranded its stores as Shoe City in 1980. Today, the Company is an urban-inspired footwear, apparel, and accessories retailer offering men's, women's, and children's products from consumer brands such as Nike, Adidas, and Puma.

10.    As of the Petition Date, the Debtor operates 39 stores in Maryland, Virginia, and the District of Columbia. The Debtor employs approximately 161 full-time employees and 233 part-time employees, with approximately 61 employees working at its corporate office and warehouse locations or as regional managers, and approximately 333 employees working at its store locations. The number of part-time employees has historically fluctuated depending on the Debtor's seasonal needs. None of the Debtor's employees are represented by a labor union.

11.    The Debtor remains a family-owned business to this day as the equity of the Debtor is owned by family members and family trusts of the founders.  Unfortunately, after 74 years in business, the Shoe City legacy has come to an end.

12.    As is discussed more herein, the Debtor commenced this Chapter 11 Case to conduct store closing sales and liquidate all of its assets for the benefit of all creditors.

## II.    PREPETITION CAPITAL STRUCTURE AND FINANCIAL OVERVIEW

### A.    Secured Debt

13.    The Debtor is party to that certain Loan Agreement dated September 19, 2017 (as amended, supplemented, or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**") with SunTrust Bank (now known as Truist Bank, and hereinafter, the "**Pre-Petition Lender**" in its capacity as lender under the Pre-Petition Credit Agreement).

5

14.     Pursuant to the Loan Agreement, the Pre-Petition Lender agreed to extend the Company a revolving loan in an aggregate principal amount not to exceed $12,000,000 (the "**Pre-Petition Credit Facility**"), amended on December 29, 2020 to an aggregate principal amount not to exceed $10,000,000.

15.     The Pre-Petition Credit Facility is secured by first priority liens over substantially all of the Debtor's assets (the "**Pre-Petition Liens**"), including the Debtor's accounts receivable, inventory, and cash collateral, all as set forth in greater detail in the Pre-Petition Credit Agreement and related documents (collectively, the "**Pre-Petition Loan Documents**").

16.     As of March 28, 2023, the unpaid principal balance owed under the Pre-Petition Credit Facility was $3,164,122.29 (the "**Pre-Petition Obligations**").

**B.      Unsecured Debt**

17.      In addition to the Pre-Petition Obligations, as of the Petition Date, the Debtor estimates that it has approximately $16 million of outstanding unsecured debt, which is comprised mostly of trade debt due to vendors.

III.    **EVENTS LEADING TO THE CHAPTER 11 FILINGS**

18.     Various factors have severely impacted the profitability of the Debtor's business, ultimately prompting the current liquidity crisis that precipitated the decision to commence this Chapter 11 Case and dispose of all assets pursuant to a Court-regulated process.

19.     Over the last several years, the Debtor suffered declines in sales and increasing losses in net income. The Debtor incurred operating losses of approximately $280,000 and $1.76 million in fiscal years 2020 and 2021, respectively, which had a significant negative impact on the Debtor's financial position and liquidity. The Debtor took a number of measures in an attempt to address these issues, including shopping the Company as a going concern as well as seeking third party financing sources for replacement financing.

6

20.      In May 2022, The Athlete's Foot parent, the Arklyz Group, executed a deal to acquire the Debtor in an effort to expand on Arklyz's North American presence. By all measures, the proposed deal was full of synergies between two companies committed to their respective communities, loyal customers, and philanthropic initiatives. Unfortunately, Arklyz did not close on the deal. As a result, the Debtor was never able to regain profitability.

21.      Starting in fiscal year 2020, certain key vendors to the Debtor's business started to change the allocation of goods provided to the Debtor. The Debtor failed to receive certain high-end goods and new sneaker releases at the levels from previous years that are critical to this industry. In fiscal year 2022, comparable-store sales decreased by approximately $8.5 million from the prior years. During the current fiscal year, sales continued to decrease by almost $5 million through January 2023 when compared to the prior fiscal year, placing increased pressure on the Debtor's liquidity position as none of the Company's efforts to improve its cash position came to fruition.

22.      As a result of the poor financial performance, the Debtor has not been in compliance with certain covenants under the Pre-Petition Credit Agreement, which constituted events of default under the Pre-Petition Credit Facility.

23.      On November 15, 2022, the Debtor and the Pre-Petition Lender entered into a Forbearance Agreement (the "**Forbearance Agreement**"), pursuant to which the Pre-Petition Lender agreed to forbear from exercising any rights and remedies under the Pre-Petition Credit Facility.

24.      In addition to the liquidity constraints caused by the revenue decline, at or around the same time, in accordance with the Forbearance Agreement, the Pre-Petition Lender imposed certain restrictions per the terms of the Pre-Petition Credit Agreement that further reduced

88833880.9

liquidity. These restrictions further impaired the Debtor's ability to (i) pay rent to many of their landlords; (ii) pay vendors in accordance with applicable terms; and (iii) purchase new and popular inventory to supplement the inventory mix at their retail locations, all of which is essential to meet trends in order to maintain customer loyalty and drive customer traffic to stores. This inventory limitation further impacted sales, resulting in the inability to attract any recapitalization interest, further threatening all value of the Debtor's business.

25.     On February 6, 2023, the Debtor and the Pre-Petition Lender entered into a Second Forbearance Agreement (the "**Second Forbearance Agreement**"), pursuant to which the Pre-Petition Lender agreed to forbear from exercising any rights and remedies under the Pre-Petition Credit Facility until March 15, 2023.

26.     As a direct result of these liquidity constraints, certain vendors would only ship product to the Debtor on a cash in advance basis, which further stressed the Debtor's liquidity position. Finally, the Debtor's top shoe vendor, terminated its contract with the Debtor in early March. Without new product on the shelves, the Debtor was left with no viable options to save the business. Accordingly, the Debtor, in consultation with the Pre-Petition Lender, agreed that the best path forward to pay off the Pre-Petition Credit Facility, and hopefully provide for a return to other creditors, was to conduct store closing sales at all 39 retail locations and liquidate substantially all of its assets for the benefit of all creditor constituencies.

27.     Through this Chapter 11 Case, the Debtor intends to liquidate substantially all of its assets through orderly going out of business and store closing sales which will provide the best result for all interested parties. The Debtor intends to conclude the store closing sales by May 31, 2023 and is hopeful that the proceeds of these sales will allow the Debtor to pay the Pre-Petition

Lender in full. The success of the store closing sales will dictate whether there is a runway for a liquidating chapter 11 plan upon the conclusion of the store closing sales.

## IV.    FIRST DAY PLEADINGS

28.    Contemporaneously with the filing of the chapter 11 petition, the Debtor seeks approval of the First Day Pleadings and related orders (the "**Proposed Orders**"). The Debtor respectfully requests that the Court enter each of the Proposed Orders as they are critical to the Debtor's success in this Chapter 11 Case.

29.    I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtor to make the transition to, and operate in, chapter 11 with minimum loss of value; and (b) constitutes a critical element in the Debtor's ability to successfully maximize value for the benefit of its estate. Below is a summary of my understanding of the First Day Pleadings and the general basis for why the relief requested in the First Day Pleadings is integral for the Debtor's estate. To the extent there is a discrepancy between the summary below and the actual First Day Pleading, the language of the First Day Pleading governs. I have reviewed all of the First Day Pleadings and incorporate all such First Day Pleadings by reference as if they were set forth in full herein.

### A.    Complex Case Notice

30.    The Debtor filed the Complex Case Notice because the Chapter 11 Case is governed by the Complex Chapter 11 Case Procedures. The Debtor has liabilities of at least $10 million (US) and more than fifty (50) creditors will be listed on the Debtor's schedules, once filed.

**B.      Schedules Extension Motion**

31.      Pursuant to the Schedules Extension Motion, the Debtor seeks entry of an order extending the deadline to file their (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, and (c) statements of financial affairs (collectively, the "**Schedules and Statements**") by an additional thirty-one (31) days, from the date such Schedules and Statements are otherwise required to be filed, to forty-five (45) total days from the Petition Date, without prejudice to the Debtor's ability to request additional time to file the Schedules and Statements should it become necessary.

32.      I believe cause exists for the following reasons: (a) the size and complexity of the Debtor's business; (b) the number of creditors; and (c) the burden which would be imposed on the Debtor to file schedules and statements within the next fourteen days. To completely and accurately file Schedules and Statements, the Debtor must collect, review, and analyze a substantial amount of information.

33.      Prior to the Petition Date, the Debtor, its advisors, and other parties in interest focused extensively on preparing for the filing and transitioning the business into the chapter 11 process. This included extensive negotiations among multiple creditor constituencies. The Debtor is working expeditiously to prepare and file its Schedules and Statements, however, given the size of the Debtor's business and the amount of information required to adequately prepare such Schedules and Statements, the Debtor respectfully requests an extension of thirty-one (31) days, without prejudice to the Debtor's right to request further extensions, for cause shown.

34.      Given the exigent circumstances of the Chapter 11 Case, I do not think the Debtor will be able to timely finalize the Schedules and Statements absent the requested extension.

10

### C.    Cash Management Motion

35.    Pursuant to the Cash Management Motion, the Debtor seeks entry of an order: (1) authorizing, but not directing, the Debtor to continue to maintain and use its existing cash management system, including maintenance of existing bank accounts, checks, and business forms; (2) granting the Debtor a temporary suspension of certain bank account and related requirements of the U.S. Trustee (as defined in the Cash Management Motion) to the extent that such requirements are inconsistent with the Debtor's practices under its existing cash management system or other actions described herein; and (3) authorizing, but not directing, the Debtor to continue to maintain and use its existing deposit practices.

36.    In the ordinary course of business, the Debtor maintains a Cash Management System (as defined in the Cash Management Motion) that is integral to the operation and administration of its business. The Cash Management System allows the Debtor to (i) monitor and control all of the Debtor's cash receipts and disbursements, (ii) identify the cash requirements of the Debtor, and (iii) transfer and disburse cash as needed to respond to the cash requirements of the Debtor. The Cash Management System is comprised of five (5) bank accounts and is specifically designed for administering the Debtor's business. Furthermore, the Cash Management System cannot be altered without significant disruption to the Debtor's business operations and material distraction to the Debtor's management.

37.    For the aforementioned reasons, I believe that maintaining the existing Cash Management System without disruption is in the best interests of the Debtor, its estate, and all interested parties. Accordingly, the Debtor requests authorization to maintain and continue to use the Cash Management System, including maintenance of its existing bank accounts.

D.    **Wages Motion**

38.    Pursuant to the Wages Motion and as described in greater detail therein, the Debtor seeks entry of an order authorizing, but not directing, the Debtor to (1) pay accrued prepetition wages, salaries, and other compensation to its workforce; (2) honor any prepetition obligations in respect of, and continue in the ordinary course of business until further notice (but not assume), certain of the Debtor's paid time off policies, and employee benefit plans and programs; (3) reimburse employees for prepetition expenses that employees incurred on behalf of the Debtor in the ordinary course of business on a prepetition basis; (4) pay all related prepetition payroll taxes and other deductions and withholdings; (5) honor workers' compensation obligations; and (6) pay any prepetition claims of administrators and providers in the ordinary course of business to the extent that any of the foregoing programs are administered, insured, or paid through a third-party administrator or provider.

39.    The Debtor needs to fund payroll on Thursday, April 6, 2023 for the payroll period covering March 19, 2023 through and including April 1, 2023 when the Debtor employed approximately 394 hourly and salaried employees. The Debtor also incurred various related obligations, including compensation, benefits, taxes, workers' compensation, expense reimbursements, and administrative costs.

40.    To ensure the successful operation of the Debtor's business and to maximize the value of the Debtor's estate, it is imperative that the Debtor honors pre and postpetition obligations to the employees and continues to maintain benefit plans in the ordinary course of business through the Chapter 11 Case. I believe that failure to promptly do so would create concern and discontent among the employees and could lead to resignations. I believe the loss of even a few key personnel would immediately and irreparably harm the Debtor's ability to maintain operations to the detriment of all interested parties.

E.     Utilities Motion

41.     Pursuant to the Utilities Motion, the Debtor seeks entry of an order (1) prohibiting Utility Companies (as defined in the Utilities Motion) from (a) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtor on account of any outstanding amounts for services rendered prepetition, or (b) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (2) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Companies providing services to the Debtor; and (3) establishing procedures for resolving future requests by any Utility Companies for additional adequate assurance of payment.

42.     In the ordinary course of business and in conjunction with their day-to-day operations, the Debtor receives utility services from various Utility Companies for, among other things, water, electricity, gas, telecommunications, and similar utility products and services. In the Utilities Motion, the Debtor proposes to make an adequate assurance deposit equal to a two-week proration of their projected utility service usage for the month of April 2023 based on their previous average utility service usage and invoices.

43.     I believe uninterrupted Utility Services are essential to the Debtor's business operations during the pendency of the Chapter 11 Case. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's business operations could be disrupted, and such disruption could jeopardize the Debtor's ability to maximize value of its estate and effect an orderly liquidation. Therefore, the Debtor seeks to establish an orderly process for providing adequate assurance to its Utility Companies without hindering the Debtor's ability to maintain operations. I am informed and believe the proposed Adequate Assurance Procedures (as defined in the Utilities Motion) are consistent with procedures that are typically approved in comparable chapter 11 cases. Accordingly, based on the foregoing and those additional reasons set forth in the

13

Utilities Motion, I believe the relief requested in such motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.

> **F.**     **Taxes Motion**

44.     By way of the Taxes Motion and further detailed therein, the Debtor respectfully requests entry of an order authorizing payment of any prepetition tax and fee obligations including, without limitation, property taxes, sales and use taxes, business license taxes and fees, pass-through federal income taxes, bag surcharges, and other state and local taxes and fees (collectively, the "**Taxes and Fees**") owing to those federal, state, and local governmental entities in the United States listed in the Taxes Motion (the "**Taxing Authorities**"). The Debtor estimates the aggregate amount of payments to be made on account of prepetition Taxes and Fees under this Motion at $308,000.

45.     For the avoidance of doubt, the requested authorization (i) would be discretionary, allowing the Debtor, among other things, to elect to pay Taxes and Fees as to which its officers and directors may have personal liability in the event of nonpayment by the Debtor, before other Taxes and Fees, and (ii) would be without prejudice to the Debtor's rights to contest the amounts of any Taxes and Fees on any grounds it deems appropriate.

46.     In addition, the Debtor requests that the Court authorize the Debtor's banks to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtor's banks and financial institutions to rely on the representations of the Debtor as to which checks and fund transfers should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

88833880.9

47.     I believe that the Taxes and Fees at issue are appropriate for payment to the extent that they are priority or secured claims that are payable in full or, alternatively, under the personal liability theory or the doctrine of necessity. By paying the Taxes and Fees in the ordinary course of business, as and when due, the Debtor will avoid unnecessary disputes with the Taxing Authorities—and expenditures of time and money resulting from such disputes—over a myriad of issues that are typically raised by such units as they attempt to enforce their rights to collect Taxes and Fees.

### G.    Insurance Motion

48.     Pursuant to the Insurance Motion and as described in greater detail therein, the Debtor seeks entry of an order: (1) authorizing, but not directing, the Debtor to continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business and pay prepetition obligations in respect thereof; (2) authorizing banks and other financial institutions at which the Debtor holds accounts to honor and process check and electronic transfer requests related to the foregoing; (3) preventing insurance companies from giving any notice of termination or otherwise modifying or cancelling any insurance policies without first obtaining relief from the automatic stay imposed by Bankruptcy Code section 362; and (4) authorizing, but not directing, the Debtor to continue to honor brokerage obligations.

49.     In the ordinary course of business, the Debtor maintains comprehensive insurance coverage through various policies in order both to mitigate risks associated with operating the Debtor's business and to comply with applicable regulations, laws, and contractual obligations. The Debtor contracts with an insurance broker to assist with the procurement and negotiation of insurance policies. To preserve liquidity, the Debtor pays all insurance policy premiums on a monthly basis. The Debtor plans to maintain such insurance coverage and honor its insurance broker obligations during the bankruptcy process because it is necessary to preserve the value of

the Debtor's estate and to abide by certain guidelines established by the U.S. Trustee (as defined in the Insurance Motion). I believe that authorizing the Debtor to continue with its pre-petition insurance practices and preventing insurers from terminating, modifying, or canceling any policies without obtaining stay relief will maximize the value of the Debtor's estate for all stakeholders.

### H.    Claims Agent Application

50.     Pursuant to the Claims Agent Application, the Debtor seeks entry of an order appointing Stretto, Inc. ("**Stretto**") as claims and noticing agent (the "**Claims and Noticing Agent**") in the Debtor's Chapter 11 Case *nunc pro tunc* to the Petition Date. Stretto is a bankruptcy administrator that specializes in providing comprehensive chapter 11 administrative services, including noticing, claims processing, balloting and other related administrative aspects of chapter 11 cases. Given the complexity of the Chapter 11 Case and the number of creditors and other parties in interest involved, I believe appointing Stretto as the Claims and Noticing Agent in the Chapter 11 Case will maximize the value of the Debtor's estate for the benefit of all stakeholders.

### I.    Customer Programs Motion

51.     Prior to the Petition Date and in the ordinary course of their business, the Debtor provides customers with certain programs that engender goodwill, maintain loyalty, increase the Debtor's sales opportunities, and allow the Debtor a comparative advantage over its competition (the "**Customer Programs**"). Through the Customer Programs, the Debtor offered gift cards, store credit notes, a layaway program, and the option for customers to make their purchases with credit cards and third-party processors such as Paypal and Klarna.

52.     Given the ongoing nature of the Debtor's operations, it is difficult to calculate the exact amount of pre-petition credit card and third-party processing fees. However, the Debtor believes its pre-petition liability on account of outstanding gift cards is approximately $162,000, of which approximately $40,000 is expected to be redeemed based on the Debtor's historical

16

redemption rates. The Debtor further estimates that approximately $11,000 in Store Credit Notes are outstanding as of the Petition Date. The Debtor does not intend to sell any gift cards or issue any store credit notes after the Petition Date and has ended the layaway program with the commencement the Chapter 11 Case.

53.    Through the Customer Programs Motion, the Debtor requests an order (a) authorizing, but not directing it: (i) to honor all Gift Cards purchased prior to the Petition Date, for a period of thirty (30) days after entry of the Interim Order; (ii) to honor all Store Credit outstanding as of the Petition Date, for a period of thirty (30) days after entry of the Interim Order; (iii) to pay any prepetition processing fees and allow Gift Card vendors to set off commissions, if any, in the ordinary course of business and (iv) to honor the Layaway Program in the ordinary course for consumers who placed items on layaway prior to the Petition Date; and (b) authorizing Banks to honor and process check and electronic transfer requests related to the Customer Programs.

54.    I believe that continuation of the Customer Programs with the modifications described in the Customer Programs Motion is reasonable and appropriate, consistent with the practices employed by other liquidating retailers, and strikes an appropriate balance between the Debtor's need to maintain its decades of goodwill with its customers through the end of the Store Closings and its need to efficiently wind down operations by May 31. Accordingly, the Debtor requests authorization to continue the Customer Programs to the extent set forth in the Motion.

**J.    Rejection Procedures Motion**

55.    Pursuant to the Rejection Procedures Motion, the Debtor requests entry of an order approving procedures for the rejection of executory contracts and unexpired leases (the "**Rejection Procedures**") and granting authority to take all actions necessary to implement such procedures, including abandonment of the Remaining Property.

17

88833880.9

56.    The Rejection Procedures Motion was designed to work in tandem with the Lease Sale Procedures Motion to form the Debtor's dual-track lease disposition strategy. Through the Rejection Procedures Motion, the Debtor requests the approval of streamlined procedures to reject those Leases that are unlikely to yield value on the open market. Thus, if and when it becomes apparent that a Lease is not marketable, the Debtor will remove such lease from the schedule of Leases subject to the Lease Sale Procedures Motion and instead reject the Lease using the procedures approved in the Rejection Procedures Motion. The Debtor believes that rejecting unprofitable Leases as soon as possible will conserve valuable estate resources for the benefit of the Debtor's creditors.

57.    I believe that the Rejection Procedures described in the Rejection Procedures Motion are fair to all parties, reasonable, and necessary under the circumstances. Moreover, I believe that the noticing provisions set forth in the Rejection Procedures will adequately protect the interests of landlords and other affected parties-in-interest.

**K.    Store Closing Procedures Motion**

58.    Pursuant to the Store Closing Procedures Motion, the Debtor requests entry of an interim order (i) authorizing the Debtor to assume the Consulting Agreements; (ii) approving procedures for store closing sales; (iii) approving the sale of Store Closure Assets free and clear of all liens, claims and encumbrances; and (iv) waiving compliance with Applicable State Laws and approving related Dispute Resolution Procedures.

59.    The Debtor proposes implementing the Store Closings using certain procedures described in the Store Closing Procedures Motion and contained in the Sale Guidelines attached to the proposed Interim Order as Schedule 2. The Debtor has determined, after consultation with its advisors and the Pre-Petition Lender, that effectuating the Store Closings and implementing the

Sale Guidelines will provide the most timely and efficient means for maximizing the value of the Store Closure Assets.

60.     To maximize the value of the Store Closure Assets and effectuate an orderly liquidation process, the Debtor also seeks authority to assume (a) the Store Closing Consulting Agreement dated as of March 16, 2023 (as further amended, revised, or supplemented from time to time, the "**Store Closing Consulting Agreement**") by and between the Debtor and Gordon Brothers Retail Partners, LLC (the "**Store Closing Consultant**"); and (b) the Real Estate Consulting and Advisory Services Agreement dated as of March 30, 2023 (as further amended, revised, or supplemented from time to time, the "**Lease Consulting Agreement**" and together with the Store Closing Consulting Agreement, the "**Consulting Agreements**") by and between the Debtor and Gordon Brothers Realty Services, LLC (the "**Lease Consultant**" and together with the Store Consultant, the "**Consultants**").

61.     The Store Closing Consultant will assist with the liquidation of all inventory, merchandise, and FF&E contained in the Debtor's warehouses, corporate offices, and Stores.

62.     The Lease Consultant will among other things, assist the Debtor with developing a strategic plan for identifying and marketing Leases that may provide value to the Debtor's estate. Because the Lease Consultant is an affiliate of the Store Closing Consultant, the Debtor expects that the Consultants will work efficiently together to liquidate the Store Closure Assets and Leases without duplication of efforts or unnecessary delay.

63.     Certain jurisdictions in which the Debtor operates stores have or may have laws, rules, regulations, or ordinances regarding licensing or other requirements (i) governing the conduct of store closings, liquidations, or other inventory clearance sales (collectively, the

"**Liquidation Sale Laws**") and/or (ii) requiring that employees receive their final paycheck at or very shortly after their final day of employment ("**Fast Pay Laws**").

64.     The Debtor believes that in most cases, the Sale Guidelines are consistent with Liquidation Sale Laws. Certain requirements, however, may hamper the Debtor's efforts to maximize the value of its Store Closure Assets and complete the Store Closings by May 31. Thus, the Debtor seeks authority from the Court to conduct the Store Closing Sales in accordance with the Sale Guidelines without complying with the Liquidation Sale Laws, when the two are inconsistent.

65.     Likewise, the Debtor requests that the Court waive compliance with any applicable Fast Pay Laws because of the number of employees expected to separate from the Company in the coming weeks. Instead, the Debtor proposes to pay such employees by the later of: (a) the Debtor's next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee.

66.     I believe that the relief requested in the Store Closing Procedures Motion is integral to maximizing value for the Debtor's estate and its economic stakeholders. Such relief will permit the Debtor to continue implementing the Store Closings at the Stores, and it will establish fair and uniform Sale Guidelines to assist the Debtor and its creditors through the Debtor's liquidation and sale processes. I also believe that the terms of the Consulting Agreements are market and reasonable, and that assumption of the Consulting Agreements is an exercise of the Debtor's sound business judgment.

### L.     Store Level Bonus Motion

67.     Through the Store Level Bonus Motion, the Debtor requests entry of an order (1) approving the Debtor's proposed Store Bonus Plan (as defined in the Store Level Bonus Motion)

and (2) authorizing the Debtor to make payments contemplated thereunder, up to approximately $193,000.

68.    The Debtor's management, in consultation with its advisors, formulated a compensation plan to incentivize the Eligible Store Employees (as defined in the Store Level Bonus Motion), whose work is critical to preserving the inventory of the Debtor, to achieve the Debtor's outlined store closing sale objectives. None of the Eligible Store Employees are insiders of the Debtor, within the meaning of section 101(31)(B) of the Bankruptcy Code.

69.    I believe that the Store Level Bonus Plan will properly incentivize the Eligible Store Employees to maximize the value of the Debtor's estate via a performance-based incentive plan that provides potential performance awards to certain of the Debtor's employees for their continued service throughout the orderly liquidation process.

### M.    DIP Motion

70.    Pursuant to the DIP Motion, the Debtor seeks entry of an interim order, among other things:

  a)    authorizing the Debtor as borrower (the "**Borrower**"), to obtain secured postpetition financing (the "**DIP Financing**" or "**DIP Credit Facility**") pursuant to the *Senior Secured, Super-Priority Debtor-in-Possession Credit Facility*, with Truist Bank as lender (the "**DIP Lender**"), substantially in the form attached to the DIP Motion as <u>Exhibit B</u> (as amended, supplemented or otherwise modified from time to time, the "**DIP Term Sheet**");
  b)    authorizing use of cash collateral within the budget agreed upon with the DIP Lender (the "**Budget**"); and
  c)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Term Sheet.

71.    The DIP Term Sheet provides that, upon entry of the Interim Order, all Pre-Petition Obligations shall become DIP Credit Facility obligations under the DIP Credit Facility Documents (the "**Roll-Up**"). I believe that the Roll-Up is necessary and appropriate, as Truist Bank, which is

both the Pre-Petition Lender and DIP Lender, has not otherwise consented to the use of cash collateral and is not willing to provide the DIP Credit Facility unless the Pre-Petition Credit Facility is permitted to be paid down, without further order of the Court, from amounts received by the Debtor following the Petition Date.

72.    The Debtor's ability to get through the Store Closings depends on obtaining immediate access to the DIP Credit Facility. The access to sufficient working capital to fund the Store Closings is vital for preserving and maintaining the value of the Debtor's assets and maximizing the value of its estate for all creditors. It will also allow the Debtor to timely pay its store employees and landlords for their cooperation in the process. Failure to obtain the relief requested in this Motion will immediately and irreparably harm the Debtor, its estate, creditors, and equity holders.

73.    Given the circumstances, the Debtor does not believe it is able to obtain financing to fund and preserve its assets on terms more favorable than those offered by the DIP Lender under the DIP Credit Facility, which terms are identical to the terms that existed under the Pre-Petition Loan Documents. The Debtor is (and has been) unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, and does not believe it is likely to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by the DIP Lender under the DIP Credit Facility. Indeed, even with respect to the DIP Lender (a party already in the Debtor's capital structure), the DIP Credit Facility is available only with the Debtor's agreement to grant the DIP Lender a first priority senior and priming lien on the DIP Collateral, subject and junior only to (a) the Carve-Out and (b) valid, enforceable, properly perfected, and unavoidable prepetition Liens (the "**DIP Credit Lien**").

74.     I believe that the Debtor will face irreparable harm without the DIP Credit Facility. Absent the DIP Credit Facility, the Debtor will quickly become administratively insolvent, leading to a conversion of the Chapter 11 Case to a Chapter 7 case and depressed recoveries for all creditors.

### N.     CRO Application

75.     Pursuant to the CRO Application, the Debtor seeks to retain Gavin/Solmonese LLC ("**G/S**") to provide a chief restructuring officer to the Debtor, as well as additional personnel to assist the CRO in performing his duties, *nunc pro tunc* to the Petition Date. G/S is an experienced financial professional firm with many years of corporate finance experience in corporate restructuring. G/S has worked with companies, management teams, boards of directors and creditor constituencies to realize value through improvement in operations and balance sheet initiatives in numerous assignments. G/S has acted as CRO for numerous clients. In that capacity, G/S has acted as the intermediary between management, creditors, and equity groups and in many cases facilitated successful reorganizations. G/S typically manages day-to-day activities, controls the checkbook, assesses the needs of the clients, and manages companies through the bankruptcy process.

76.     My appointment as CRO in this Chapter 11 Case will allow me to leverage both my personal experience serving a similar role for other companies with the institutional knowledge and resources of G/S. Since G/S was engaged, I have been working diligently to identify the Debtor's assets, review the Debtor's books and records, and assemble the information necessary to provide to the Court, all while responding to numerous creditor inquiries and negotiating the Debtor's post-petition financing. Given my industry expertise and knowledge of the Company, I believe that I am well-qualified to serve as the Debtor's CRO and that my appointment would be in the best interests of the Debtor, its creditors, and estate.

23

## O.    Lease Sale Motion

77.    The Debtor commenced this Chapter 11 Case to effectuate an orderly wind down and the Store Closings as quickly and efficiently as possible. In an effort to maximize value of the estate, the Debtor has engaged the Lease Consultant to review the Leases and determine which, if any can be monetized through a Court-supervised sale process. Because the Lease Consultant has not yet performed its analysis, the Debtor does not know which, if any, of the Leases will attract market interest and which Leases should be promptly rejected to avoid the accrual of administrative rent expenses. The Debtor has filed this Motion to proactively establish the Auction Procedures at the outset of the Chapter 11 Case so that it will be prepared to run a value-maximizing sale process that will terminate at approximately the same time as the Store Closing Sales. The proposed timeline for the sale process is as follows:

> **May 1, 2023**: Deadline to serve Auction and Hearing Notice
> **May 12, 2023 at 5:00 p.m. ET**: Bid Deadline
> **May 15, 2023 at 9:30 a.m. ET**: Auction, if necessary
> **May 16, 2023**: Deadline to file notice of successful bidder(s)
> **May 23, 2023 at 5:00 p.m. ET**: Objection Deadline
> **May 25, 2023 at 1:30 p.m. ET**: Sale Hearing
> **May 31, 2023**: Sale Closing Deadline

78.    Contemporaneously herewith, the Debtor has also filed the Rejection Procedures Motion, by which the Debtor requests that the Court approve certain procedures for the prompt rejection of Leases that the Debtor, in consultation with the Lease Consultant, determines are unlikely to yield value through a sale process.

79.    Without having the Auction Procedures and a sale timeline in place, the Debtor would be forced to reject all of the Leases as the Premises are vacated without the opportunity to determine which, if any, of those Leases may provide the estate with much-needed liquidity. By commencing the sale process now, the Debtor will be well poised to auction off the Leases that will provide value to estate once the Store Closings are complete. Conversely, if the Debtor, in

24

consultation with the Lease Consultant determines that none of the Leases have value or if there is no market interest in any of the Leases, the Debtor can simply cancel the Auction. I believe that such flexibility is necessary in this Chapter 11 Case given the speed with which the Store Closings will occur and the Debtor's dire liquidity situation.

80.     I believe that the Auction Procedures described in the Lease Sale Procedures Motion are fair to all parties in interest, reasonable, and designed to produce a robust bidding and sale process. I further believe that the sale timeline proposed by the Debtor is appropriate under the circumstances and, more importantly, will ensure that the Debtor does not accrue administrative rent charges for the month of June.

## CONCLUSION

81.     In sum, the First Day Pleadings seek authority to, among other things, continue the honor work-force related compensation and benefit obligations, pay certain prepetition claims, and continue using the Debtors' bank accounts, continue other operations during the liquidation of the business, and use of the Debtor's cash collateral while also obtaining additional financing to ensure seamless operations during the wind-down process. The Debtors have narrowly tailored the First Day Pleadings to meet the goals of: (i) continuing its operations in chapter 11 to maximize value for the Debtor's estate and its creditors; (ii) provide an adequate runway for the Debtor to effectuate a liquidation of all of its assets during the Chapter 11 Case; and (iii) establishing procedures for the efficient administration of the Chapter 11 Case.

82.     I have reviewed each of the First Day Pleadings and corresponding exhibits. I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on the Debtor's management, the books and records, and professional advisors. I

88833880.9

respectfully request that each of the First Day Pleadings be granted in its entirely, together with other and further relief as this Court deems just and proper.

Dated: April 3, 2023                            */s/ Stanley W. Mastil*
_____
                                               Stanley W. Mastil
                                               Proposed Chief Restructuring Officer
                                               **ESCO, Ltd.**

88833880.9