Entered: April 5th, 2023
Signed: April 5th, 2023

**SO ORDERED**



DAVID E. RICE
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | |
|---|---|
| In re: | Chapter 11 |
| ESCO, Ltd.,[1] | Case No. 23-12237 (DER) |
| Debtor. | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO ASSUME THE
CONSULTING AGREEMENTS; (II) APPROVING PROCEDURES FOR STORE
CLOSING SALES; (III) APPROVING THE SALE OF STORE CLOSURE ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (IV)
WAIVING COMPLIANCE WITH APPLICABLE STATE LAWS AND APPROVING
<u>DISPUTE RESOLUTION PROCEDURES; AND (V) GRANTING RELATED RELIEF</u>**

Upon the *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Assume the Consulting Agreements; (II) Approving Procedures for Store Closing Sales; (III) Approving the Sale of Store Closure Assets Free and Clear of All Liens, Claims and Encumbrances; (IV) Waiving Compliance with Applicable State Laws and Approving Dispute Resolution Procedures; and (V) Granting Related Relief* [Docket No. 24] (the "**Motion**")[2] filed by the above-captioned debtor (the "**Debtor**"), for entry of an interim order (the "**Interim Order**")

---

[1] The Debtor in this Chapter 11 case and the last four digits of its federal tax identification are ESCO, Ltd., DBA Shoe City (5654). The Debtor's principal address is 1800 Woodlawn Drive, Gwynn Oak, Maryland 21207-4007.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion.

88648513.5

(i) authorizing the Debtor to assume the Consulting Agreements; (ii) approving the sale guidelines described in the Motion; (iii) approving the sale of Store Closure Assets free and clear of all liens, claims and encumbrances; (iv) waiving compliance with Applicable State Laws and approving Dispute Resolution Procedures; and (v) granting related relief, all as further described in the Motion; and upon consideration of the First Day Declaration and the record of the Chapter 11 Case; and this Court having found that (i) this Court has jurisdiction over the Debtor, its estate, property of its estate and to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334, (ii) this Court may enter a final order consistent with Article III of the United States Constitution, (iii) this is a core proceeding under 28 U.S.C § 157(b)(2)(A), (iv) venue of this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409, and (v) no further or other notice of the Motion is required under the circumstances; and this Court having reviewed the Motion and having heard the statements in support of the relief requested in the Motion at a hearing before this Court; and having determined that the legal and factual bases set forth in the Motion and the First Day Declaration establish just cause for the relief granted in this Interim Order; and this Court having found and determined that the relief sought in the Motion is in the best interests of the Debtor's estate, creditors and other parties in interest; and after due deliberation and sufficient cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[3]

1.     The Debtor has advanced sound business reasons for (i) conducting the Sales and Store Closings, (ii) seeking to assume the Consulting Agreements and (iii) adopting the sale guidelines attached hereto as Schedule 2 (the "**Sale Guidelines**").

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. *See* Fed. R. Bankr. P. 7052.

88648513.5

2.      Entering into the Consulting Agreements is a reasonable exercise of the Debtor's business judgment and in the best interests of the Debtor and its estate.

3.      Conducting the Store Closings in accordance with the Sale Guidelines will provide an efficient means for the Debtor to dispose of the Store Closure Assets.

4.      The Consulting Agreements were negotiated, proposed, and entered into by the Consultants and the Debtor without collusion, in good faith and from arm's length bargaining positions.

5.      The assumption of the Consulting Agreements is a sound exercise of the Debtor's business judgment.

6.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtor and its estate and the Debtor has demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

7.      The Store Closings and the Sales are in the best interest of the Debtor's estate.

8.      The entry of this Interim Order is in the best interest of the Debtor and its estate, creditors, interest holders, and all other parties in interest; and now therefore;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED, on an interim basis, as set forth herein.

2.      The final hearing (the "**Final Hearing**") on the Motion shall be held on **April 27, 2023 at 2:00 p.m. (prevailing Eastern Time**) in the United States Bankruptcy Court for the District of Maryland, 101 W. Lombard St., Baltimore, MD 21201. Any objections or responses to entry of a final order on the Motion (each, an "**Objection**") shall be filed on or before **4:00 p.m. (ET) on April 20, 2023,** and served on the following parties: (i) the Debtor, 1007 Orange St., 4th Floor, Suite 461, Wilmington, DE 19801 (Attn: Stanley W. Mastil, Chief Restructuring Officer);

(ii) proposed counsel for the Debtor, Polsinelli PC, 222 Delaware Ave., Suite 1101, Wilmington, DE 19801 (Attn: Christopher A. Ward and Shanti M. Katona); (iii) the Office of the United States Trustee, 101 West Lombard Street, Suite 2625, Baltimore, MD 21201 (Attn: Hugh M. Bernstein); (iv) counsel to any statutory committee appointed in the Chapter 11 Case; (v) counsel to the DIP Lender, Holland & Knight LLP, One Arts Plaza, 1722 Routh Street, Suite 1500, Dallas, TX 75201 (Attn: Brent R. McIlwain); and (vi) counsel to the Consultants, Riemer & Braunstein LLP, Times Square Tower, Suite 2506, Seven Times Square, New York, NY 10036 (Attn: Steven E. Fox). In the event no Objections to entry of a final order on the Motion are timely received, this Court may enter such final order without need for the Final Hearing.

3.      The Debtor is authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Order.

4.      To the extent of any conflict between this Interim Order, the Sale Guidelines, and the Consulting Agreements, the terms of the Sale Guidelines shall control.

5.      Notwithstanding Bankruptcy Rules 6003(b), 6004(h), and 6006(d), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

**A.      Authority to Assume the Consulting Agreements**

6.      The Consulting Agreements, copies of which are attached to this Interim Order as Schedule 1-A and 1-B, respectively, are hereby assumed in their entirety, including any applicable amendments thereto, pursuant to Bankruptcy Code § 365 on an interim basis. The Debtor is authorized to act and perform in accordance with the terms of the Consulting Agreements, including making payments required by the Consulting Agreements to the Consultants without the need for any application of the Consultants or further order of the Court.

88648513.5

7.      Notwithstanding the provisions of Paragraph 6 of this Interim Order, within 30 days of the Sale Term's conclusion, the Debtor shall file with the Court and serve on the United States Trustee and any Committee of Unsecured Creditors that is appointed:

      a.    a summary report of the store closing process that will include (i) a list of the stores closed and (ii) gross revenue from the store closing assets sold, and

      b.    file with the Court and serve on the United States Trustee, the Committee, and any other party in interest who may so request, a report showing payment of each of the Store Closing Consultant's fees, setting forth detail and information regarding the calculation of such fees paid to the Store Closing Consultant and expenses reimbursed to the Store Closing Consultant.

8.      The United States Trustee and any Committee of Unsecured Creditors that is appointed, shall have 20 days after the date on which the above-described report is filed to object, under the standards of section 328(a) of the Bankruptcy Code, solely as to the reasonableness of the compensation paid or expenses reimbursed to the Store Closing Consultant; provided, however, that with respect to any such objection:

      a.    the Store Closing Consultant's "Base Fee," "Incentive Fee," and reimbursement of expenses shall be reviewed under the standards of section 328(a) and are found to be reasonable as of the date hereof, and such Base Fee shall not be later deemed unreasonable on the basis that the success of the sale, whether on account of sales, recovery, or otherwise, resulted in the Store Closing Consultant receiving compensation, in dollar terms, that was greater than any budget or forecast provided by the Debtor, its advisors, and/or the Store Closing Consultants; and

      b.    Any other fee not reflected in the Store Closing Consulting Agreement shall not receive the same presumption and shall be reviewed under the standards of section 330 of the Bankruptcy Code.

9.      To the extent an objection is filed and cannot be resolved, the parties shall coordinate to have the objection to the Store Closing Consultant's compensation brought before the Court at the next scheduled omnibus hearing.

88648513.5

10.     Subject to the restrictions set forth in this Interim Order and the Sale Guidelines, the Debtor and the Consultants are hereby authorized to take any and all actions as may be necessary or desirable to implement the Consulting Agreements and the Sales.

11.     Each of the transactions contemplated by the Consulting Agreements, and any actions taken by the Debtor and the Consultants necessary or desirable to implement the Consulting Agreements, the Sale Guidelines, and/or the Sales prior to the date of this Interim Order, hereby are approved and ratified.

**B.      Authority to Engage in Store Closing Sales**

12.     The Debtor is authorized, pursuant to Bankruptcy Code §§ 105(a) and 363(b)(1), to immediately continue and conduct Sales at the Stores in accordance with this Interim Order and the Sale Guidelines.

13.     The Sale Guidelines are approved in their entirety on an interim basis.

14.     The Debtor is authorized to discontinue operations at the Stores in accordance with this Interim Order and the Sale Guidelines.

15.     All entities that are presently in possession of some or all of the Merchandise or FF&E in which the Debtor holds an interest that are or may be subject to the Sale Guidelines or this Interim Order are hereby directed to surrender possession of such Merchandise or FF&E to the Debtor or the Store Closing Consultant.

16.     Neither the Debtor nor the Store Closing Consultant nor any of their officers, employees, or agents shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in Bankruptcy Code § 101(27)) or landlord, to conduct the Store Closings in accordance with the Sale Guidelines and to take the related actions authorized herein.

C.     **Conduct of the Sales**

17.     All newspapers and other advertising media in which the Sales may be advertised and all landlords are directed to accept this Interim Order as binding authority so as to authorize the Debtor and the Store Closing Consultant to conduct the Sales and the sale of Merchandise and FF&E pursuant to the Sale Guidelines, including, without limitation, to conduct and advertise the sale of the Store Closure Assets in the manner contemplated by and in accordance with this Interim Order and the Sale Guidelines.

18.     Except as provided for in this Interim Order and the Sale Guidelines, the Debtor and Store Closing Consultant are hereby authorized to take such actions as may be necessary and appropriate to conduct the Sales without necessity of further order of this Court as provided in the Sale Guidelines, including, but not limited to, advertising the sale as a "store closing sale," "sale on everything," "everything must go," "going-out-of-business," or similar-themed sales through the posting of signs (including the use of exterior banners at non-enclosed mall Stores, and at enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area), use of sign-walkers, and street signage.

19.     Notwithstanding anything herein to the contrary, and in view of the importance of the use of sign-walkers, banners, and other advertising to the sale of the Merchandise and FF&E, to the extent that disputes arise during the course of such sale regarding laws regulating the use of sign-walkers, banners or other advertising and the Debtor and the Store Closing Consultant are unable to resolve the matter consensually with a Governmental Unit, any party may request a hearing with this Court pursuant to these provisions. Subject to the Court's schedule and to the extent practicable, such hearing shall be scheduled no later than **two business days** of such request.

This scheduling shall not be deemed to preclude additional hearings for the presentation of evidence or arguments as necessary.

20.    Except as expressly provided in the Sale Guidelines, the sale of the Merchandise and FF&E shall be conducted by the Debtor and the Store Closing Consultant notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, the assumption and assignment or rejection of leases, abandonment of assets, or "going dark" provisions. The Store Closing Consultant and landlords of the Stores are authorized to enter into agreements ("**Side Letters**") between themselves to govern the conduct of the Sales and modifying the Sale Guidelines without further order of the Court, and such Side Letters shall be binding as among the Store Closing Consultant and any such landlords, *provided that*, in the event that a Side Letter affects Pre-Petition Collateral or DIP Collateral (in each case, as defined in the Interim DIP Order) at the applicable Store, such Side Letter is in form and substance acceptable to the DIP Lender. In the event of any conflict between the applicable lease provisions and any Side Letter, the terms of such Side Letter shall control. Further, in the event of any conflict between a Side Letter, this Interim Order, the Store Closing Consulting Agreement or the Sale Guidelines, the terms of any Side Letter governing signage and the day-to-day conduct of the Sales, shall control over this Interim Order and the Sale Guidelines.

21.    Except as expressly provided for herein or in the Sale Guidelines, no person or entity, including, but not limited to, any landlord, licensor, service providers, utilities, and creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sales or the sale of Store Closure Assets, or the advertising and promotion (including the posting of signs and exterior banners or the use of sign-walkers) of such Sales, and all such parties and persons of every nature and description, including, but not limited to, any

landlord, licensor, service providers, utilities, and creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (i) interfering in any way with, obstructing, or otherwise impeding, the conduct of the Sales and/or (ii) instituting any action or proceeding in any court (other than in the Court) or administrative body seeking an order or judgment against, among others, the Debtor, the Store Closing Consultant, or the Stores' landlords that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales or sale of the Merchandise or FF&E or other liquidation sales at the Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

22.     The Store Closing Consultant shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Debtor for the purpose of conducting the Sales, free of any interference from any entity or person, subject to compliance with the Sale Guidelines and this Interim Order.

23.     All sales of Store Closure Assets shall be "as is", final, and not subject to the Debtor's refund policy. Returns related to the purchase of Store Closure Assets shall not be accepted; *provided, however*, the Store Closing Consultant shall accept returns of any goods that contain a material defect which the lay consumer could not reasonably determine was defective by visual inspection prior to purchase for a full refund, provided that the consumer must return the merchandise within the time period proscribed by the Debtor's return policy that was in effect when the merchandise was purchased, the consumer must provide a receipt, and the asserted defect must in fact be a "latent" defect.

24.     The payment of any and all sales taxes is the responsibility of the Debtor. The Debtor is directed to remit all taxes arising from the Sales to the applicable Governmental Units

88648513.5

as and when due, provided that in the case of a bona fide dispute the Debtor is only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit. Sales taxes collected and held in trust by the Debtor shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected. The Store Closing Consultant shall collect, remit to the Debtor and account for sales taxes as and to the extent provided in the Store Closing Consulting Agreement. This Interim Order does not enjoin, suspend or restrain the assessment, levy or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

25.     Pursuant to Bankruptcy Code § 363(f), all sales of Store Closure Assets pursuant to the Sales, whether by the Store Closing Consultant or the Debtor, shall be free and clear of any and all encumbrances; provided, however, that any such encumbrances shall attach to the proceeds of the Sales with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Store Closure Assets, subject to any claims and defenses that the Debtor may possess with respect thereto and the Store Closing Consultant's fees and expenses (as provided in the Store Closing Consulting Agreement).

26.     To the extent that the Debtor proposes to sell or leave in place FF&E which may contain personal and/or confidential information about the Debtor's employees and/or customers as such term is defined in Bankruptcy Code § 101(41A) (the "**Personally Identifiable Information**"), the Debtor shall remove the Personally Identifiable Information from such items of FF&E.

27.     The Debtor and/or the Store Closing Consultant (as the case may be) are authorized and empowered to transfer Merchandise and FF&E among the Stores. The Store Closing

10

Consultant is authorized to sell the Debtor's FF&E or leave in place the same, in each case, as provided for and in accordance with the terms of the Sale Guidelines.

**D.      Dispute Resolution Procedures with Governmental Units and Landlords**

28.      Nothing in this Interim Order, the Store Closing Consulting Agreement, or the Sale Guidelines releases, nullifies, or enjoins the enforcement of any liability to a Governmental Unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Order. Nothing contained in this Interim Order, the Sale Guidelines, or the Store Closing Consulting Agreement shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligation of the Debtor to comply with environmental laws consistent with its rights and obligations as a debtor in possession under the Bankruptcy Code. The Store Closings and the Sales shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General Laws**"). Nothing in this Interim Order, the Store Closing Consulting Agreement, or the Sale Guidelines shall alter or affect the Debtor's obligation to comply with all applicable federal safety laws and regulations ("**Safety Laws**").

29.      Nothing in this Interim Order shall be deemed to bar any Governmental Unit (as such term is defined in Bankruptcy Code § 101(47)) from enforcing Safety Laws or General Laws in the applicable non-bankruptcy forum, subject to the Debtor's right to assert in that forum or before this Court that any such laws are not in fact Safety Laws or General Laws or that such enforcement is impermissible under the Bankruptcy Code or this Interim Order. Notwithstanding

11

any other provision in this Interim Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code. Nothing in this Interim Order shall be deemed to have made any rulings on any such issues.

30.    To the extent that the sale of Store Closure Assets is subject to any Liquidation Sale Laws, including any federal, state or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, laws restricting safe, professional and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Store Closure Assets, the dispute resolution procedures in this section shall apply:

    i.    Provided that the Sales are conducted in accordance with the terms of the Sale Guidelines and the Interim Order, the Debtor and the Store Closing Consultant will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Interim Order and the Sale Guidelines without the necessity of further showing compliance with any Liquidation Sale Laws.

    ii.    Within **three (3) business days** after entry of this Interim Order, the Debtor will serve by overnight delivery, copies of the Interim Order, the proposed Final Order, and the Sale Guidelines on the following: (a) the Attorney General's Office for Maryland, Virginia, and the District of Columbia (Attn: Consumer Protection Division); (b) the chief legal counsel for each county in which Sales are being held; (c) the county consumer protection agency or similar agency for each county where the Sales are being held; (d) the division of consumer protection for each state where the Sales are being held; (e) all Store landlords and their counsel of record (if known); and (f) counsel to the Store Closing Consultant (collectively, the "**Dispute Notice Parties**").

    iii.    To the extent that there is a dispute arising from or relating to the Sales, the Interim Order, the proposed Final Order, or the Sale Guidelines, as applicable, which dispute relates to any Liquidation Sale Laws (a "**Reserved Dispute**"), the Court shall retain exclusive jurisdiction to

resolve the Reserved Dispute. Any time within **ten (10) days** following entry of the Interim Order, any Governmental Unit may assert that a Reserved Dispute exists by sending a notice (the "**Dispute Notice**") explaining the nature of the dispute to: (a) the Debtor, 1007 Orange St., 4th Floor, Suite 461, Wilmington, DE 19801 (Attn: Stanley W. Mastil, Chief Restructuring Officer); (b) proposed counsel to the Debtor, Polsinelli PC, 222 Delaware Ave., Suite 1101, Wilmington, DE 19801, Attn: Christopher A. Ward, cward@polsinelli.com, and Shanti M. Katona, skatona@polsinelli.com; (c) counsel for the DIP Lender, Holland & Knight LLP, One Arts Plaza, 1722 Routh St., Suite 150, Dallas, TX 75201, Attn: Brent R. McIlwain (Brent.McIlwain@hklaw.com); (d) counsel to the official committee of unsecured creditors, if appointed; (e) the United States Trustee for the District of Maryland; (f) counsel for the Store Closing Consultant, Riemer & Braunstein, Times Square Tower, Suite 2506, Seven Times Square, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com); and (g) the affected landlords and their counsel, if known. If the Debtor and the Governmental Unit are unable to resolve the Reserved Dispute within **15 days** after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "**Dispute Resolution Motion**").

iv.   In the event that a Dispute Resolution Motion is filed, nothing in this Interim Order shall preclude the Debtor, a landlord, or any other interested party from asserting (A) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (B) that neither the terms of the Interim Order nor the conduct of the Debtor pursuant to the Interim Order, violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not (i) affect the finality of this Interim Order or (ii) limit or interfere with the Debtor's or the Store Closing Consultant's ability to conduct or to continue to conduct the Sales pursuant to this Interim Order, absent further order of the Court. Upon the entry of the Interim Order, the Court grants authority for the Debtor and the Store Closing Consultant to conduct the Sales pursuant to the terms of the Interim Order, and/or the Sale Guidelines, and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

v.   If, at any time, a dispute arises between the Debtor and/or the Store Closing Consultant, on the one hand, and a Governmental Unit, on the other hand, as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Interim Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions above by serving a notice to the other party and proceeding thereunder in accordance

13

with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

31.    Notwithstanding anything to the contrary in this Interim Order, the term "**Liquidation Sale Laws**" shall be deemed not to include any Safety Laws or General Laws, and the Debtor and the Store Closing Consultant shall continue to be required to comply, as applicable, with such Safety Laws and General Laws, subject to any applicable provision of the Bankruptcy Code and federal law, and nothing in this Interim Order shall be deemed to bar Governmental Units (as defined in Bankruptcy Code § 101(27)) or any public officials from enforcing Safety Laws or General Laws.

32.    Subject to the terms of this Interim Order, each and every federal, state, or local agency, departmental, or Governmental Unit with regulatory authority over the Sales and all newspapers and other advertising media in which the Sales are advertised shall consider this Interim Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtor or the Store Closing Consultant be required to post any bond, to conduct the Sales.

33.    Provided that the Sales are conducted in accordance with the terms of this Interim Order and the Sale Guidelines, the Debtor, the Store Closing Consultant, and the landlords of the Stores shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Sales in accordance with the terms of this Interim Order without the necessity of further showing compliance with any such Liquidation Sale Laws.

88648513.5

E.      **Other Provisions**

34.     The Consulting Agreements and related documents may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of this Court *provided, however*, entry into any such modifications, amendments, or supplements is subject to the prior written consent of the DIP Lender.

35.     The Consultants shall not be liable for any claims against the Debtor, and the Debtor shall not be liable for any claims against the Consultants, in each case, other than as expressly provided for in the Consulting Agreements.

36.     To the extent the Debtor is subject to any state "fast pay" laws in connection with the Store Closings, the Debtor shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtor's next regularly scheduled payroll; and (b) **seven calendar days** following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

cc:     Jack Blum, Esquire
        1401 Eye Street, N.W.
        Suite 800
        Washington, DC 20005

        Christopher A. Ward
        Shanti M. Katona
        Polsinelli PC
        222 Delaware Ave., Suite 1101
        Wilmington, DE 19801

        Hugh M. Bernstein, Counsel for the U.S. Trustee
        Office of the United States Trustee
        101 W. Lombard St., Suite 2625
        Baltimore, MD 21201

88648513.5

Brent R. McIlwain
Holland & Knight LLP
One Arts Plaza
1722 Routh St., Suite 1500
Dallas, TX 75201

Steven E. Fox
Riemer & Braunstein, LLP
Times Square Tower, Suite 2506
Seven Times Square
New York, NY 10036

**END OF ORDER**

## **SCHEDULE 1-A**

**Store Closing Consulting Agreement**



Dated as of March 16, 2023

To:      Esco, Ltd.
         1800 Woodlawn Drive
         Baltimore, MD 21207

From:    Gordon Brothers Retail Partners, LLC
         800 Boylston Street, 27th Floor
         Boston, MA 02199

         **Re:  Store Closing Consulting Agreement**

Ladies and Gentlemen:

This letter shall serve as the agreement between Gordon Brothers Retail Partners, LLC ("Consultant") and Esco, Ltd. ( "Merchant" and together with Consultant, the "Parties") pursuant to which Consultant shall serve as the exclusive consultant to Merchant to conduct a store closing sale (the "Sale") at Merchant's retail store locations identified on **Exhibit A** (each a "Store" and collectively the "Stores"), subject to the terms and conditions set forth herein.

1. **RETENTION**

   (A)  Merchant hereby retains Consultant as its exclusive, independent consultant to conduct the Sale during the Sale Term and provide the following services:

   (i)   Recommend appropriate strategies to effectively sell all of the goods located at the Stores during the Sale Term and the Offered FF&E

   (ii)  Recommend appropriate point-of-purchase, point-of-sale or other internal and external advertising in connection therewith;

   (iii) Provide qualified supervision to oversee the conduct of the Sale;

   (iv)  Maintain focused and constant communication with Store-level employees and managers to keep them abreast of strategy and timing and to properly effect Store-level communication by Merchant's employees to customers and others about the Sale;

   (v)   Establish and monitor accounting functions for the Sale, including evaluation of sales of Merchant's goods located at the Stores by category, sales reporting and expense

monitoring;

(vi) Recommend loss prevention strategies;

(vii)     Coordinate with Merchant so that the operation of the Stores is being properly maintained including ongoing customer service and housekeeping activities;

(viii)     Recommend appropriate staffing levels for the Stores and appropriate bonus and/or incentive programs (to be funded by Merchant) for Store employees;

(ix) Recommend appropriate staffing levels for the Stores; and

(x) Advise Merchant with respect to the legal requirements of effecting the Sale as a "store closing" "going out of business," "everything must go," "sale on everything," or other mutually agreed upon theme in compliance with applicable state and local "going out of business" laws.

## 2.  SALE TERM; VACATING LOCATIONS

(A)   The "Sale Term" shall commence on March 23, 2023 and terminate no later than May 28, 2023; provided, that the Parties may mutually agree in writing to amend the Sale Term with respect to any one or more Stores.

(B)   Upon the conclusion of the Sale Term, Consultant shall leave the Stores in broom clean condition, subject to Consultant's right pursuant to Section 6 below to abandon in a neat and orderly manner all unsold Offered FF&E and all Retained FF&E.

## 3.  EXPENSES

(A)   Merchant shall be responsible for all expenses incident to the conduct of the Sale and the operation of the Locations during the Sale Term, including without limitation all Consultant Controlled Expenses (defined below) and all other Location-level and corporate expenses associated with the Sale.

(B)   Consultant will advance funds for certain expenses associated with the Sale ("Consultant Controlled Expenses").   Merchant shall reimburse Consultant for Consultant Controlled Expenses incurred by Consultant in connection with each weekly reconciliation contemplated by Section 5(B), subject to the budget attached as **Exhibit B** (the "Budget").   The parties may from time to time, including through email correspondence, mutually agree in writing to amend the Budget based upon circumstances of the Sale.   All Consultant Controlled Expenses, to the extent not previously reimbursed during the Sale Term, shall be reimbursed in connection with

the Final Reconciliation pursuant to <u>Section 5(B)</u> below.

## 4.   <u>CONSULTANT COMPENSATION</u>

(A)   <u>Definitions.</u>   As used herein, the following terms shall have the following meanings:

(i)   "<u>Cost Value</u>" means, with respect to each item of Merchandise, the lower of (1) the lowest per unit vendor cost for such Merchandise in the File or in Merchant's books and records, maintained in the ordinary course consistent with historic practices; or (2) the Retail Price.

(ii)   "<u>File</u>" means the inventory file(s) provided by Merchant to Consultant setting forth the goods to be sold in connection with the Sale.

(iii)  "<u>Gross Proceeds</u>" means the sum of the gross proceeds of all sales of Merchandise (including as a result of the redemption of any gift card, gift certificate, or merchandise credit) during the Sale Term, net only of sales taxes.

(iv)  "<u>Gross Recovery Percentage</u>" means the Gross Proceeds divided by the sum of the aggregate Cost Value of the Merchandise sold during the Sale Term.

(v)   "<u>Merchandise</u>" shall mean all goods actually sold in the Stores during the Sale Term, the aggregate amount of which shall be determined using the gross rings inventory taking method.

(vi)  "<u>Retail Price</u>" means, with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, stickered, hang-tag, or File price.

(B)   <u>Merchandise Fee.</u>  In consideration of Consultant's services hereunder, Merchant shall pay Consultant a fee equal to 2.0% of the Gross Proceeds of Merchandise sold at the Stores during the Sale Term (the "<u>Base Fee</u>"). In addition to the Merchandise Fee, Merchant shall pay Consultant from Gross Proceeds an additional fee based upon the applicable Gross Recovery Percentage set forth below (calculated back to the first dollar) (the "<u>Incentive Fee</u>" and together with the Base fee, the "<u>Merchandise Fee</u>"):

| Gross Recovery Percentage | Incentive Fee |
|---|---|
| Between 100% and 104% | 0.00% of Gross Proceeds |
| Between 105% and 108% | 0.50% of Gross Proceeds |
| Between 109% and 113% | 1.00% of Gross Proceeds |
| Above 114% | 1.50% of Gross Proceeds |

(C)   <u>Gross Rings.</u>  For purposes of calculating Gross Proceeds and the Merchandise Fee, the Parties shall use the "Gross Rings" method, wherein Consultant and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes, and (ii) cash reports of sales within each Store.  Register receipts shall show for each item sold the Cost Value and

Retail Price (as reflected on Merchant's books and records) for such item, and the markdown or other discount granted in connection with such sale. All such records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

(D)  **Weekly Payments.**  On a weekly basis in connection with the weekly reconciliations contemplated by Section 5(B) below, Merchant shall pay Consultant (i) an amount equal to the Merchandise Fee payable on account of the prior week's sales as an advance towards the total Merchandise Fee; (ii) any FF&E Commission earned during the prior week; and (iii) all gross proceeds from Additional Consultant Goods (less the Additional Consultant Goods Fee). The parties shall determine the definitive Merchandise Fee, FF&E Commission and Additional Consultant Goods Fee in connection with the Final Reconciliation.

## 5.  CONDUCT OF SALE; OTHER SALE MATTERS

(A)  Merchant shall have control over the personnel in the Stores and shall handle the cash, debit and charge card payments for all Merchandise in accordance with Merchant's normal cash management procedures, subject to Consultant's right to audit any such items in the event of a good faith dispute as to the amount thereof. Merchant (and not Consultant) shall be responsible for ensuring that the Sale, and the operation of the Stores is conducted in compliance with all applicable laws and regulations, and in compliance with all applicable lease provisions with respect to the Stores.

(B)  The Parties will meet on each Wednesday during the Sale Term to review any Sale matters reasonably requested by either party and, in connection with such weekly meetings, all amounts payable (under Section 4(D)) or reimbursable (under Section 3(B)) to Consultant for the prior week shall be reconciled and paid immediately thereafter.  No later than twenty (20) days following the end of the Sale, the Parties shall complete a final reconciliation and settlement of all amounts contemplated by this Agreement (the "Final Reconciliation").

(C)  From time to time upon request, each party shall prepare and deliver to the other party such other reports as either party may reasonably request.  Each party to this Agreement shall, at all times during the Sale Term and during the one-year period thereafter, provide the other with access to all information, books and records relating to the Sale and to this Agreement. All records and reports shall be made available to Consultant and Merchant during regular business hours upon reasonable notice.

(D)  Merchant shall be solely responsible for computing, collecting, holding, reporting, and paying all sales taxes associated with the sale of Merchandise during the Sale Term, and Consultant shall have absolutely no responsibilities or liabilities therefor.

(E)  Although Consultant shall undertake its obligations under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the recovery to the Merchant, Merchant expressly acknowledges that Consultant is not guaranteeing the results of the Sale.

(F)  Merchant acknowledges that (i) the Parties are not conducting an inventory of Merchant's goods located at the Stores; (ii) Consultant has made no independent assessment of the

4

beginning levels of such goods; and (iii) Consultant shall not bear any liability for shrink or other loss to Merchant's goods located at the Stores (including without limitation Merchandise).

(G)   All sales of Merchandise during the Sale Term shall be made in the name, and on behalf, of Merchant.

(H)   All sales of Merchandise during the Sale Term shall be "final sales" and "as is," and all advertisements and sales receipts will reflect the same.

(I)   Merchant hereby permits the Sale to be, and shall ensure that the Sale otherwise may be, advertised as a "going out of business," "store closing," "everything must go," "sale on everything," or such other mutually agreed upon themed sale throughout the term of the Sale.

(J)   Upon the execution of, and as a condition to Consultant's obligations under, this Agreement, Merchant shall fund to Consultant $400,000 (the "Special Purpose Payment") which shall be held by Consultant until the Final Reconciliation (and Merchant shall not apply the Special Purpose Payment to, or otherwise offset any portion of, the Special Purpose Payment against, any weekly reimbursement, payment of fees, or other amount owing to Consultant under this Agreement prior to the Final Reconciliation).  To the extent Consultant incurs any fees or expenses (including Consultant Controlled Expenses) before the Sale Term, Merchant shall reimburse Consultant for such fees or expenses on demand and ensure that the Special Purpose Payment is replenished. Without limiting any of Consultant's other rights, Consultant may apply the Special Purpose Payment to any unpaid obligation owing by Merchant to Consultant under this Agreement. Any portion of the Special Purpose Payment not used to pay amounts explicitly contemplated by this Agreement shall be returned to Merchant within three days following the Final Reconciliation.

## 6.   FF&E DISPOSITION

(A) Promptly following the commencement of the Sale Term, Merchant shall inform Consultant of those items of owned furnishings, trade fixtures, equipment, machinery, office supplies, racking, rolling stock, any vehicles or other modes of transportation, and other personal property (collectively, "FF&E") located at the Stores which are not to be sold (because Merchant does not have the right to sell such items, because Merchant wishes to retain such items for itself, or otherwise) (collectively, "Retained FF&E").

(B)   With respect to all FF&E located at the Stores as of the commencement of the Sale Term which is not Retained FF&E (collectively, the "Offered FF&E"), Consultant shall have the right to sell such Offered FF&E during the Sale Term on a commission basis equal to 20% of the gross sales of Offered FF&E, net only of sales tax.

(C)   Merchant shall reimburse Consultant for its reasonable sale expenses associated with the sale of the Offered FF&E, not to exceed the amount shown on an FF&E expense budget (which shall be in addition to the Consultant Controlled Expenses budget), to be mutually agreed to by the Parties promptly after Merchant identifies the Offered FF&E and Retained FF&E.

(D)   Consultant shall have the right to abandon any unsold Offered FF&E (and all Retained

FF&E) at the Stores at the conclusion of the Sale Term without liability to Merchant or any third party.

## 7. ADDITIONAL CONSULTANT GOODS

(A)   In connection with the Sale, Consultant shall have the right, at Consultant's sole cost and expense, to supplement the Merchandise in the Sale with additional goods procured by Consultant which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Consultant Goods"). The Additional Consultant Goods shall be purchased by Consultant and delivered to the Stores at Consultant's sole expense (including labor, freight and insurance relative to shipping such Additional Consultant Goods to the Stores).  Sales of Additional Consultant Goods shall be run through Merchant's cash register systems; provided, however, that Consultant shall mark the Additional Consultant Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Consultant Goods from the sale of Merchandise.  Consultant and Merchant shall also cooperate so as to ensure that the Additional Consultant Goods are marked in such a way that a reasonable consumer could identify the Additional Consultant Goods as non-Merchant goods. Additionally, Consultant shall provide signage in the Stores notifying customers that the Additional Consultant Goods have been included in the Sale.  Absent Merchant's written consent, and Consultant's agreement to reimburse Merchant for any associated expenses, Consultant shall not use Merchant's distribution centers for any Additional Consultant Goods.

(B)   Consultant shall pay to Merchant an amount equal to five percent (5%) of the gross proceeds (excluding sales taxes) from the sale of the Additional Consultant Goods (the "Additional Consultant Goods Fee"), and Consultant shall retain all remaining amounts from the sale of the Additional Consultant Goods.

(C)   Consultant and Merchant intend that the transactions relating to the Additional Consultant Goods are, and shall be construed as, a true consignment from Consultant to Merchant in all respects and not a consignment for security purposes.  Subject solely to Consultant's obligations to pay to Merchant the Additional Consultant Goods Fee, at all times and for all purposes the Additional Consultant Goods and their proceeds shall be the exclusive property of Consultant, and no other person or entity shall have any claim against any of the Additional Consultant Goods or their proceeds.  The Additional Consultant Goods shall at all times remain subject to the exclusive control of Consultant.

(D)   Merchant shall, at Consultant's sole cost and expense, insure the Additional Consultant Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.  Consultant shall be responsible for payment of any deductible (but only in relation to the Additional Consultant Goods) under any such insurance in the event of any casualty affecting the Additional Consultant Goods.

(E)   Merchant acknowledges that the Additional Consultant Goods shall be consigned to Merchant as a true consignment under Article 9 of the Uniform Commercial Code (the "UCC").  Consultant is hereby granted a first-priority security interest in and lien upon (i) the Additional Consultant Goods and (ii) the Additional Consultant Goods proceeds, and Consultant is hereby authorized to file UCC financing statements and provide notifications to

any prior secured parties.

## 8.  **LEASE-RELATED SERVICES**

At Merchant's request, Consultant may act as Merchant's exclusive, independent consultant to provide lease-related services, including but not limited to, marketing and selling Merchant's leasehold interests in the Stores on Merchant's behalf in exchange for a fee to be determined upon mutual agreement of the Parties.

## 9.  **INSURANCE; RISK OF LOSS**

(A)   During the Sale Term: (a) Merchant shall maintain (at its expense) insurance with respect to the Merchandise in amounts and on such terms and conditions as are consistent with Merchant's ordinary course operations, and (b) each of Merchant and Consultant shall maintain (at each party's respective expense) comprehensive liability insurance covering injuries to persons and property, in such amounts as are reasonable and consistent with its ordinary practices, for bodily injury, personal injury and/or property damage. Each party shall be added as an additional insured on all such insurance of the other party, all such insurance shall provide that it shall be non-cancelable and non-changeable except after 30 days' prior written notice to the other party, and each party shall provide the other with certificates of all such insurance prior to the commencement of the Sale.

(B)   Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Consultant shall not be deemed to be in possession or control of the Stores, or the Merchandise or FF&E located therein or associated therewith, or of Merchant's employees located at the Stores; and Consultant does not assume any of Merchant's obligations or liabilities with respect thereto.

(C)   Notwithstanding any other provision of this Agreement, Merchant and Consultant agree that Merchant shall bear all responsibility for liability claims (product liability and otherwise) of customers, employees and other persons arising from events occurring at the Stores, and Merchandise sold in the Stores, before, during and after the Sale Term.

## 10. **INDEMNIFICATION**

(A)   Consultant shall indemnify and hold Merchant and its affiliates, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Merchant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

  (i)   Consultant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

  (ii)  any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Consultant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives

(including without limitation any supervisors);

(iii) any claims by any party engaged by Consultant as an employee or independent contractor (including without limitation any non-Merchant employee supervisor) arising out of such employment or engagement; or

(iv) the gross negligence, willful misconduct or unlawful acts of Consultant, its affiliates or their respective officers, directors, employees, Consultants, independent contractors or representatives.

(B)  Merchant shall indemnify and hold Consultant, its affiliates, Auctioneer, and their respective officers, directors, employees, consultants, and independent contractors (collectively, "Consultant Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to:

(i)  Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained herein or in any written agreement entered into in connection herewith;

(ii)  any claims by any party engaged by Merchant as an employee or independent contractor arising out of such engagement;

(iii) any third party claims relating to any Offered FF&E or the Locations;

(iv) any claim by any owner or landlord of the Locations with respect the Sale and Auction being conducted at such premises;

(v)  the gross negligence, willful misconduct or unlawful acts of Merchant, its affiliates or their respective officers, directors, employees, agents, independent contractors or representatives.

## 2.  MISCELLANEOUS

(A)  In the event of Merchant's filing under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), this Agreement, including retention of Consultant and conduct of the Sale set forth herein, shall be subject to the approval of the applicable United States Bankruptcy Court (the "Bankruptcy Court"). Merchant shall promptly seek to have this Agreement, and the transactions contemplated by this Agreement approved by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code (and not pursuant to sections 327, 328, 330, or 331 thereof) and an order with terms acceptable to both Merchant and Consultant that provides, among other things, for: (i) the payment of all fees and reimbursement of expenses hereunder to Consultant is approved without further order of the court and shall be free and clear of all liens, claims and encumbrances; (ii) all such payments of fees and reimbursement of expenses shall be made on a weekly basis without further order of the Bankruptcy Court and otherwise in accordance with this Agreement; (iii) approval of the transaction contemplated hereby; and (iv) protection of Consultant's fees and expenses to

ensure the payment of such fees and expenses are permitted under any debtor-in-possession financing or cash collateral budget (the "Approval Order"). In such event, any legal action, suit or proceeding arising in connection with this Agreement shall be submitted to the exclusive jurisdiction of the Bankruptcy Court having jurisdiction over Merchant, and each Party hereby waives any defenses or objections based on lack of jurisdiction, improper venue, and/or forum non conveniens. From and after entry of the Approval Order, Consultant shall conduct the Sale in accordance with the terms of the Approval Order in all material respects. In the event the Approval Order is not entered by the Bankruptcy Court or Merchant does not comply with the terms of this Agreement or the Approval Order does not include the terms and conditions contained herein, (i) Merchant shall reimburse Consultant for any Consultant Controlled Expenses incurred in connection with the Sale through and including the day immediately after denial of such motion by the Bankruptcy Court or the date of Merchant's breach of this Agreement, as applicable; and (ii) Consultant may, in its sole discretion, elect to terminate this Agreement. Further upon disclosure to Merchant, Consultant shall have the right to syndicate and partner with additional entities to serve as "Consultant" hereunder as to this Agreement and as to any similar agreements.

(B) This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto. This Agreement may not be modified except in a written instrument executed by each of the parties hereto. No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. The failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder. Nothing contained in this Agreement shall be deemed to create any relationship between Merchant and Consultant other than that of Consultant as an independent contractor of Merchant, and it is stipulated that the parties are not partners or joint venturers in any way. Unless expressly set forth herein to the contrary, to the extent that either party's consent is required/requested hereunder, such consent shall not be unreasonably withheld or delayed. This Agreement shall inure to the benefit of, and be binding upon, the parties and their respective successors and assigns; provided, however, that this Agreement may not be assigned by either party without the prior written consent of the other. Written notices contemplated by this Agreement shall be sent by email (i) if to Merchant c/o Chris Ward at cward@polsinelli.com; and (ii) if to Consultant c/o Durien Sanchez at dsanchez@gordonbrothers.com and David Braun at dbraun@gordonbrothers.com.

*[Signature Pages Follow]*

Very truly yours,

**GORDON BROTHERS RETAIL
PARTNERS, LLC**

By: _____

Name: Durleñ Sanchez

Title:  Managing Director


Agreed and Accepted:
**ESCO, LTD.**

By: _____

Name: Greg Greenberg

Title:  President


Exhibits:
A        Stores
B        Budget


*[Signature Page to Consulting Agreement]*

# ESCO Ltd.
## Exhibit A
## Store List

| Store No. | Store | Address | City | State | Zip Code | Square Ft |
|---|---|---|---|---|---|---|
| 101 | Downtown Shoe City | 315-319 W. Lexington Street | Baltimore | MD | 21201 | 4,950 |
| 102 | Edgewater Village Shoe City | 1875 Pulaski Highway, Space 400 | Edgewood | MD | 21040 | 5,040 |
| 105 | Monument Shoe City | 2237 E. Monument Street | Baltimore | MD | 21205 | 2,000 |
| 115 | Mondawmin Shoe City | Mondawmin Mall | Baltimore | MD | 21215 | 8,786 |
| 116 | Reisterstown Shoe City | 6534 Reisterstown Road | Baltimore | MD | 21215 | 6,000 |
| 118 | Waverly Shoe City | 3211 Greenmount Avenue | Baltimore | MD | 21218 | 4,744 |
| 123 | Westside Shoe City | 2441 Frederick Avenue | Baltimore | MD | 21223 | 5,237 |
| 124 | Westside Clearance Center | 2431 Frederick Avenue | Baltimore | MD | 21223 | 4,000 |
| 125 | Patapso Village Shoe City | 3418 Annapolis Road | Baltimore | MD | 21227 | 7,260 |
| 130 | Chesapeake Square Shoe City | 6714 Governor Ritchie Highway | Glen Burnie | MD | 21061 | 4,813 |
| 139 | Perring Parkway Shoe City | 2333 Cleanleigh Drive | Baltimore | MD | 21234 | 5,546 |
| 140 | Golden Ring Plaza Shoe City | 8649 Philadelphia Road | Baltimore | MD | 21237 | 4,561 |
| 150 | Eastpoint Mall Shoe City | 7839 Eastern Avenue | Baltimore | MD | 21224 | 6,719 |
| 160 | Security Square Mall Shoe City | 6901 Security Boulevard | Baltimore | MD | 21244 | 8,667 |
| 170 | Valley Center Shoe City | 9616 Reisterstown Road | Owings Mills | MD | 21117 | 6,787 |
| 177 | Erdman Shoe City | 3943 Erdman Avenue | Baltimore | MD | 21213 | 5,200 |
| 230 | Laurel Shopping Center Shoe City | 357 Montrose Avenue | Laurel | MD | 20707 | 6,630 |
| 240 | Prince Georges Plaza Shoe City | 3500 East-West Highway | Hyattsville | MD | 20902 | 9,905 |
| 250 | Enterprise Plaza Shoe City | 9321 Annaplis Road #1010 | Lanham | MD | 20706 | 6,500 |
| 260 | Wheaton Plaza Shoe City | 11160 Veirs Mill Road #167 | Wheaton | MD | 20902 | 5,962 |
| 265 | Ellsworth Place Shoe City | 8661 Colesville Road | Silver Spring | MD | 20910 | 4,872 |
| 271 | Largo Town Center Shoe City | 930 Largo Center Drive | Upper Marlboro | MD | 20774 | 5,175 |
| 280 | Iverson Mall Shoe City | 3737 Branch Avenue | Temple Hills | MD | 20748 | 6,279 |
| 281 | Eastover Shoe City | Eastover Shopping Center | Oxon Hill | MD | 20745 | 8,250 |
| 282 | H Street Shoe City | 717 H Street, NE | Washington | DC | 20002 | 5,789 |
| 283 | Alabama Shoe City | 2851 Alabama Avenue, SE | Washington | DC | 20020 | 3,553 |
| 284 | King's Highway Shoe City | 7001 Martin Luther King Jr. Highway | Hyattsville | MD | 20785 | 6,300 |
| 285 | Rhode Island Shoe City | 1060 Brentwood Road, NE | Washington | DC | 20018 | 3,750 |
| 286 | Benning Shoe City | 3935A Minnesota Avenue, NE | Washington | DC | 20019 | 8,600 |
| 290 | Forestville Shoe City | 3393 Donnel Drive Suite C | Forestville | MD | 20747 | 5,288 |
| 295 | Brandywine Shoe City | 1590F Crain Highway, SE | Brandywine | MD | 20613 | 5,000 |
| 301 | Chesterfield Town Center Shoe City | 11500 Midlothian Turnpike #700 | Richmond | VA | 23225 | 5,288 |
| 322 | Southside Plaza Shoe City | 4740 N. Southside Plaza | Richmond | VA | 23224 | 8,750 |
| 327 | White Oak Village Shoe City | 4501 S Laburnum Avenue #445 | Richmond | VA | 23223 | 5,045 |
| 329 | New Oak Hill Shoe City | 3091 Mechanicsville Turnpike | Richmond | VA | 23223 | 6,720 |
| 330 | Southpark Mall Shoe City | 74 South Park Circle | Colonial Heights | VA | 23834 | 5,601 |
| 401 | JANAF Shopping Yard Shoe City | 5802 E Virginia Beach Boulevard #118 | Norfolk | VA | 23502 | 6,197 |
| 402 | Victory Crossing Shoe City | 4020 Victory Boulevard | Portsmouth | VA | 23701 | 6,000 |
| 403 | Coliseum Shoe City | 34 Coliseum Crossing | Hampton | VA | 23666 | 5,000 |

39

# ESCO Ltd.
## GBRP's Controlled Expenses
## Exhibit B

| | |
|---|---|
| **# Stores :** | **39** |
| **Sale Term :** | **3/23/23 - 5/28/23** |
| **# Weeks :** | **9.6** |

| | **$** |
|---|---|
| **Advertising** | **356,146** |
| **Supervision** | **483,667** |
| **Miscellaneous** | **50,000** |
| **Total Expenses** | **889,814** |

This expense budget is based upon the above start and end dates.
Any changes in these dates may result in adjustments to the expense
budget, which will be agreed upon by Consultant and Merchant.

Any legal expenses incurred by Consultant will be in addition to
and not part of the above budget.

# **SCHEDULE 1-B**

**Lease Consulting Agreement**

## <u>REAL ESTATE CONSULTING AND ADVISORY SERVICES AGREEMENT</u>

This Agreement is entered into effective as of March 30, 2023, by and between Gordon Brothers Realty Services, LLC ("Gordon Brothers") and Esco, Ltd. and its affilates and subsidiaries (collectively, the "Company").

Recitals<b>:</b>

WHEREAS, the Company is the owner of the leasehold interests listed on Exhibit A attached hereto (each a "Lease" and collectively, the "Leases"); and

WHEREAS, the Company seeks to engage Gordon Brothers to provide certain consulting services in connection with the Leases as provided herein.

Agreement:

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Gordon Brothers agree as follows:

1) <u>Consulting and Advisory Services</u>.  Gordon Brothers shall provide the consulting and advisory services described below (collectively, the "Services") to the Company with respect to the Leases:

   a) Meet with the Company to ascertain the Company's goals, objectives and financial parameters;

   b) Mutually agree with the Company with respect to a strategic plan for restructuring, assigning, or terminating the Leases (the "Strategic Plan");

   c) On the Company's behalf, negotiate the terms of restructuring, assignment, and termination agreements with third parties and the landlords under the Leases, in accordance with the Strategic Plan;

   d) Provide written reports periodically to the Company regarding the status of such negotiations; and

   e) Assist the Company in closing the pertinent Lease restructuring, assignment, and termination agreements.

2) <u>Term and Termination</u>.

   a) <u>Term</u>.  The term of this Agreement shall commence upon the execution hereof and shall expire on the date that is eight (8) months therefrom.

   b) <u>Termination</u>.  The Company shall have the right to terminate this Agreement for cause upon written notice to Gordon Brothers.  Termination for cause shall mean any termination as a result of Gordon Brothers's failure to diligently perform the Services or

1

any fraud, misrepresentation, gross negligence, willful misconduct or material breach by Gordon Brothers of any of the terms of this Agreement.

c) <u>Effect of Termination</u>.  Upon termination of this Agreement by the Company, Gordon Brothers shall: (i) immediately discontinue all Services; and (ii) deliver to the Company all information, reports, papers, and other materials prepared or obtained by Gordon Brothers in performing the Services, whether completed or in process.  Upon termination, the Company shall be liable only for payment of accrued and unpaid Expenses of Gordon Brothers as of the effective date of the termination; and no compensation shall be due unless such fees shall have been earned by Gordon Brothers as of the effective date of termination in accordance with Sections 5 and 6 below.

3) <u>Authority</u>.  Gordon Brothers shall serve as the Company's exclusive agent for the purpose of the Services.  All communications and inquiries regarding restructuring, assigning, or terminating the Leases, including those directed to the Company (including (without limitation) its officers, agents and employees), shall be redirected to Gordon Brothers, unless otherwise agreed to by Gordon Brothers and the Company.  Gordon Brothers shall promptly advise the Company of all offers made with respect to the Leases.  Gordon Brothers is authorized only to negotiate the terms of agreements with respect to the restructuring, assigning, or terminating the Leases in accordance with the Strategic Plan at the direction and on the behalf of the Company, but not to commit the Company to any such agreement or arrangement or to sign any instrument on behalf of the Company.  Company has the right, in its sole discretion, to accept or reject any offers with respect to the Leases, and, in the event of such rejection, the Company shall not be liable to Gordon Brothers for any fee or compensation, except as provided in Sections 5 and 6 below.

4) <u>Company Cooperation</u>.  The Company shall provide Gordon Brothers with all information concerning the Leases necessary for the performance of Gordon Brothers' obligations hereunder, including, but not limited to (a) copies of the Leases and any Lease abstracts, (b) populating an Excel spreadsheet provided by Gordon Brothers or providing already prepared spreadsheets with, among other things, all relevant store/premises sales and EBITDA for the current and previous fiscal years and projected 12-months sales and EBITDA if available, current rents, estimated taxes and, if available, other charges relating to the Leases, rent bumps, percentage rent and breakpoints, premises size, the commencement and expiration dates of the Leases, any Lease options, up to date landlord contact information (including name, email and phone number information for each landlord) and (c) such other information as Gordon Brothers requests for the performance of its services relating to the Leases (collectively, the "Lease Information"). Additionally, the Company agrees to utilize its own financial analysts, when available, to prepare financial models relative to rent reduction requests, while Gordon Brothers will provide guidance and assumptions to assist the Company in the preparation of the requests.

Additionally, the Company agrees to assist Gordon Brothers in the performance of its services, including but not limited to, by (i) completing, with Gordon Brothers' assistance, a schedule which shall contain the proposed request for each Lease (the "Lease Request"), (ii) providing a response, within seven (7) business days of Gordon Brothers' transmittal to the Company of a Deal Sheet (as defined in Section 5(c) below) for each Lease (the "Deal Sheet

Deadline"), which states whether a proposed service transaction is approved or not, and (iii) supplying all necessary legal support to review Documents (as defined below) submitted by Gordon Brothers in connection with a service and getting all Documents in form and substance acceptable to the Company executed accurately and timely; provided, however, the Company's approval of a proposed service transaction shall be deemed given if: (a) a Deal Sheet for any Lease is consistent with the Lease Request, and (b) the Company does not respond to a Deal Sheet by the Deal Sheet Deadline.  In addition, the Company shall track the status of all Documents through an Gordon Brothers legal tracking report provided by Gordon Brothers or such other report that the Company provides Gordon Brothers access to as part of the engagement.

5) <u>Compensation</u>. As compensation for Gordon Brothers' Services, the Company will pay to Gordon Brothers compensation in accordance with the following.

   a) <u>Definitions and Compensation</u>.

      i) "Assigned Lease" means any Lease for which the Company enters into a written agreement that has the effect of assigning the Lease.

      ii) "Assignment Fee" means, for any Assigned Lease, an amount equal to six percent (6.0%) of the Gross Sale Proceeds with respect to any Assigned Lease.

      iii) "Designation Rights Leases" means any Leases for which the Company enters into a written designation rights agreement for such Leases.

      iv) "Designation Rights Fee" means, for any Designation Rights Leases, an amount equal to six percent (6.0%) of the Gross Sale Proceeds with respect to any Designation Rights Leases.

      v) "Document" means an amendment or executed agreement that modifies a Lease in accordance with the terms of an approved Deal Sheet on a form approved by the Company.  A Document shall also include any letter agreement relating to a Lease, or any other formal written communication from a landlord or third party consenting to the terms of an approved Deal Sheet, that is legally binding on such landlord or third party.  For the avoidance of doubt, a Document can be generated by the landlord, a third party or the Company, but must include the signature of an authorized representative of the landlord or third party to be bound by the terms of such Document.

      vi) "Gross Sale Proceeds" shall be defined as the total consideration paid to the Company by a landlord, tenant, investor, purchaser or any other party with respect to any Assigned Lease, Designation Rights Leases or Terminated Lease.  It includes, but is not limited to, any fees and any other form of currency paid or waived by the landlord, sub-tenant or other third party to the Company. This list is not meant to be exhaustive and Gross Sale Proceeds shall include any consideration or other quantifiable economic benefit paid or payable to the Company in conjunction with any Assigned Lease, Designation Rights Leases or Terminated Lease, including the return of any security deposits.  Except as set forth herein, Gordon Brothers shall not

be responsible for any other fees or commissions in connection with the disposition of any Leases, including, but not limited to, any fees or commissions that may be owed by the Company to any previous real estate brokers.

vii) "Restructured Lease" means any Lease for which the Company enters into a written agreement with the applicable landlord that has the effect of modifying the terms of such Lease.

viii)   "Restructured Lease Savings Fee" means, for any Restructured Lease, an amount equal to the greater of (a) the aggregate Restructured Lease Savings multiplied by four and one half of one percent (4.5%) and (b) 50% of one month's gross occupancy cost, plus an additional fee of $500 for non-economic modifications to such Restructured Lease. Unless the Company consents to Gordon Brothers pursuing a Restructured Lease on its behalf, the Restructured Lease Savings Fee shall be payable only if the Restructured Lease is assumed and assigned to a potential buyer and the buyer agrees to assume the payment obligations to Gordon Brothers for such Restructured Lease Savings Fee.

ix) "Restructured Lease Savings" means an amount equal to the the net savings created by a Restructured Lease, including (without limitation) the sum of (x) the annualized reduction of base rent, percentage rent, CAM, real estate taxes, insurance, and deferred maintenance or maintenance obligations (including clean up) payable under a lease (inclusive of term shortening), and (y) the aggregate amount of any tenant improvement allowance dollars secured, minus any restructuring, termination or similar fees paid by the Company to the counterparty to the leased property, or any other party, in connection with the Restructured Lease. Where term is extended and the rent during such extended period is not specifically fixed or calculable within a leased property, Restructured Lease Savings shall be based on the last year's rent immediately prior to the extended period under a leased property.

x) "Terminated Lease" means any Lease for which the Company enters into a written agreement with the applicable landlord that has the effect of terminating such Lease.

xi) "Terminated Lease Fee" means, for any Terminated Lease, an amount equal to six percent (6.0%) of the Gross Sale Proceeds with respect to any Terminated Lease.

b) <u>Time Extensions to Assume or Reject a Lease</u>. If requested, for each time extension to assume or reject any Lease negotiated by Gordon Brothers, Gordon Brothers will earn and be paid a fee of $500.00 per Lease extended. Any fee under this section shall be paid at the time extension is secured.

c) <u>Payment of Fees</u>. Gordon Brothers shall provide the Company with a deal sheet with the terms of the proposed Restructured Lease, Assigned Lease, Designation Rights Leases, or Terminated Lease (the "Deal Sheet"). For clarification purposes, a Deal Sheet can include, but not be limited to, an email or other written communication from Gordon Brothers setting forth the terms of the proposed Service. If the Company approves or is

deemed to have approved the terms of the Deal Sheet and the landlord or other third party (if applicable) executes a Document that reflects the Company accepted Deal Sheet and the Company begins to receive the benefit of the terms set forth in the Deal Sheet (the "Triggering Event"), Gordon Brothers shall be entitled to, and be paid, its fees in accordance with the above fee structure. For the avoidance of doubt, Gordon Brothers shall be entitled to its fees notwithstanding the fact that a transaction is not fully executed by the Company.  The fees set forth above are independent and can be earned separately.

d)  The Company shall, other than fees for non-monetary Lease modifications or time to extend to assume or reject a Lease, which shall be paid within five (5) business days of receipt of an invoice, unless otherwise stated above, (i) be paid fifty percent (50%) of its earned fees upon the Triggering Event and remaining fifty percent (50%) upon assumption (and, if applicable, assignment) or termination of the particular Lease; and (ii) in the event of an Assigned Lease, Designation Rights Lease, or Terminated Lease, Gordon Brothers shall be paid its earned fee thereon at the closing thereof.

6)  <u>Expenses</u>.  All Expenses (defined below) shall be borne by the Company, and Gordon Brothers shall be entitled to reimbursement from the Company for all Expenses.  Billing shall be monthly and invoices are due not later than thirty (30) days after the date of invoice.  "Expenses" means all reasonable, documented (through receipts or invoices) out-of-pocket expenses incurred by Gordon Brothers in connection with its performance of its Services hereunder, including, without limitation: reasonable expenses of advertising, marketing, coach travel and transportation, including, the cost of out-of-town travel and postage and courier/overnight express fees and other mutually agreed upon expenses incurred in connection with performing the services required by this Agreement.

7)  <u>Survival</u>.  Within fifteen (15) calendar days after termination of this Agreement, Gordon Brothers shall provide the Company with a list of all third parties, including landlords (each, a "Prospect") that Gordon Brothers has engaged in negotiations with respect to the Leases covered hereunder.  If within one hundred and eighty (180) days after the expiration of the Term of this Agreement, or any extension thereof agreed to in writing by the Company and Gordon Brothers, the Company and any Prospect should enter into a written agreement covered by this Agreement, incorporating deal terms that are identical or reasonably similar to terms that were negotiated and/or proposed by Gordon Brothers in connection with the Leases, or, alternatively, has submitted a letter of intent, draft purchase and sale agreement or introduced into a potential transaction (i.e. contained within the above referenced list) by Gordon Brothers in connection with the Properties, Gordon Brothers shall be entitled to a fee calculated in accordance with the terms of this Agreement.

8)  <u>Gordon Brothers and Company Covenants</u>.  In consideration of this Agreement, Gordon Brothers agrees to utilize commercially reasonable efforts and diligence to achieve the purpose of this Agreement.  Gordon Brothers shall conduct all negotiations on behalf of the Company in accordance with industry best practices and in accordance with the Company's and its officers', representatives' and counsel's reasonable instructions.   The Company agrees to cooperate reasonably with Gordon Brothers and to make available to Gordon Brothers such information as

Gordon Brothers reasonably requests, including true and correct copies of the Leases, all information relating to occupancy-related expenses for the Leases and related correspondence.

9) <u>Confidentiality</u>.  Gordon Brothers acknowledges that information furnished or made available by the Company, its affiliates, employees or representatives ("Representatives") to Gordon Brothers and its Representatives relating to the Leases and the business or affairs of the Company is confidential and is the property of the Company.  During and after the term of this Agreement, Gordon Brothers will not disclose any such information to any person other than its Representatives or use any such information for any purpose other than the performance of its obligations hereunder, in each case, without the prior written consent of the Company; provided, that Gordon Brothers may disclose such information to prospective Lease buyers or assignees so long as such parties agree in writing to maintain the confidentiality thereof.

10) <u>Assignment; Successors and Assigns</u>.  Neither party may assign its rights or delegate any of its obligations hereunder without the prior written consent of the other party.  Subject to that limitation, this Agreement shall be binding upon and shall inure to the benefit of each party and its successors and assigns.

11) <u>Indemnification</u>.

    a) The Company shall indemnify Gordon Brothers and its Representatives and hold them harmless against any and all losses, claims, damages, liabilities and expenses incurred by Gordon Brothers and its Representatives, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with the negotiation, execution and/or rendering of services by Gordon Brothers hereunder, unless such losses, claims, damages, liabilities and expenses resulted from the fraud, misrepresentation, gross negligence, willful misconduct or material breach by Gordon Brothers or its Representatives of any of the terms of this Agreement.

    b) Gordon Brothers shall indemnify the Company and its Representatives and hold them harmless against any and all losses, claims, damages, liabilities and expenses incurred by the Company and its Representatives, including without limitation, reasonable legal expenses, arising from, related to, or in any way connected with fraud, misrepresentation, gross negligence, willful misconduct or material breach by Gordon Brothers or its Representatives of any of the terms of this Agreement.

12) <u>General Provisions</u>.

    a) The Company and Gordon Brothers shall deal with each other fairly and in good faith so as to allow both parties to perform their duties and earn the benefits of this Agreement. The Company acknowledges that Gordon Brothers is a subsidiary of Gordon Brothers Group, LLC, a large organization with subsidiaries and affiliates which, in the ordinary course of business, engage in a wide range of activities and transactions, including without limitation, asset dispositions, appraisals, real estate consulting and investments, and financial services and investments.  Gordon Brothers has previously engaged, and may engage in the future, with the Company in connection with loan transactions and providing asset disposition services to the Company.

b) The Company recognizes and acknowledges that the services to be provided by Gordon Brothers pursuant to this Agreement are, in general, transactional in nature, and Gordon Brothers will not be billing the Company by the hour or maintaining time records. It is agreed that Gordon Brothers is not requested or required to maintain such time records and that its compensation will be fixed on the percentages set forth herein.

c) Any correspondence or required notice shall be addressed as follows:

> If to Gordon Brothers: Gordon Brothers Realty Services, LLC
> 800 Boylston Street
> Boston, MA 02199
> Attn:  Thomas Pedulla
> (tpedulla@gordonbrothers.com)
> David Braun (dbraun@gordonbrothers.com)

> If to the Company: Esco, Ltd.
> 1800 Woodlawn Drive
> Baltimore, MD 21207
> Tel.  (215) 704-2388
> Attn:  Stanley Mastil, CRO
>  (stanley.mastil@gavinsolmonese.com)

d) This Agreement shall be deemed drafted by both parties hereto, and there shall be no presumption against either party in the interpretation of this Agreement.

e) By executing or otherwise accepting this Agreement, the Company and Gordon Brothers acknowledge and represent that they are represented by and have consulted with independent legal counsel with respect to the terms and conditions contained herein.

f) The construction, validity and interpretation of this Agreement will be governed by the internal law of the State of New York, without regard to any choice of law principle that might otherwise result in the application of the law of any other jurisdiction. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other in respect of any matter arising out of or in connection with this Agreement.

g) This Agreement may be executed in original counterparts, and if executed and delivered via facsimile shall be deemed the equivalent of an original.

h) The parties hereto agree, and the Company hereby expressly acknowledges, that Gordon Brothers has not guaranteed the Company any return or results with respect to the services to be provided.

i) This Agreement constitutes the entire agreement between the Company and Gordon Brothers and supersedes all prior discussions, negotiations, understandings,

representations, and agreements, whether oral or written. This Agreement shall not be modified or amended in any respect except by a written instrument executed by or on behalf of the parties to this Agreement.

j)  If either party institutes legal action to enforce its rights under this Agreement, the prevailing party will be entitled to recover its reasonable attorneys' fees and other costs actually incurred.

k)  Gordon Brothers may use the Company's name on Gordon Brothers' representative client lists, in any advertisements, publications or as a reference.

l)  To the extent the Company files for chapter 11 bankruptcy protection, the Company agrees to apply to the Bankruptcy Court for an order, in a form acceptable to Gordon Brothers, authorizing the Company to retain and compensate Gordon Brothers in accordance with the terms of this Agreement and to use its best efforts to obtain such order. The Company agrees to (a) seek the retention of Gordon Brothers on an expedited basis and (b) file any applications necessary and otherwise assist Gordon Brothers in obtaining Bankruptcy Court approval of the payment of its fees and costs hereunder. The Company agrees to provide Gordon Brothers with a copy of the pleadings requesting retention of Gordon Brothers prior to submission to the Bankruptcy Court for Gordon Brothers' review and comments and advise Gordon Brothers of any objection or hearings pertaining to Gordon Brothers' retention. The order authorizing Gordon Brothers' retention must be reasonably acceptable to Gordon Brothers and Gordon Brothers' obligations hereunder are conditioned upon the grant of such order. Furthermore, if such order is not obtained within thirty (30) days from the date that it is filed, Gordon Brothers shall have the right to terminate this Agreement at any time thereafter. In the event the Company is unable to obtain a reasonably acceptable hiring order authorizing the hiring and retention of Gordon Brothers under the terms of this Agreement and the Agreement is terminated, Gordon Brothers reserves the right to seek a substantial contribution claim for any rights or obligations incurred or accrued prior to such termination.

*          *          *

IN WITNESS WHEREOF, the Company and Gordon Brothers have executed and delivered this Agreement as of the date first above written.

**ESCO, LTD.**                          **GORDON BROTHERS REALTY SERVICES, LLC**

By: _Stanley Mastil_                    By: _Thomas V. Pedulla_

Title: Stanley Mastil, Chief Restructuring Officer    Title: Thomas V. Pedulla, Senior Managing Director

Date: 3/30/23                           Date: 3/30/23

**EXHIBIT A**

Leases

# ESCO Ltd.
## Exhibit A
## Store List

| Store No. | Store | Address | City | State | Zip Code | Square Ft |
|---|---|---|---|---|---|---|
| 101 | Downtown Shoe City | 315-319 W. Lexington Street | Baltimore | MD | 21201 | 4,950 |
| 102 | Edgewater Village Shoe City | 1875 Pulaski Highway, Space 400 | Edgewood | MD | 21040 | 5,040 |
| 105 | Monument Shoe City | 2237 E. Monument Street | Baltimore | MD | 21205 | 2,000 |
| 115 | Mondawmin Shoe City | Mondawmin Mall | Baltimore | MD | 21215 | 8,786 |
| 116 | Reisterstown Shoe  City | 6534 Reisterstown Road | Baltimore | MD | 21215 | 6,000 |
| 123 | Westside Shoe City | 2441 Frederick Avenue | Baltimore | MD | 21223 | 5,237 |
| 124 | Westside Clearance Center | 2431 Frederick Avenue | Baltimore | MD | 21223 | 4,000 |
| 125 | Patapso Village Shoe City | 3418 Annapolis Road | Baltimore | MD | 21227 | 7,260 |
| 130 | Chesapeake Square Shoe City | 6714 Governor Ritchie Highway | Glen Burnie | MD | 21061 | 4,813 |
| 139 | Perring Parkway Shoe City | 2333 Cleanleigh Drive | Baltimore | MD | 21234 | 5,546 |
| 140 | Golden Ring Plaza Shoe City | 8649 Philadelphia Road | Baltimore | MD | 21237 | 4,561 |
| 150 | Eastpoint Mall Shoe City | 7839 Eastern Avenue | Baltimore | MD | 21224 | 6,719 |
| 160 | Security Square Mall Shoe City | 6901 Security Boulevard | Baltimore | MD | 21244 | 8,667 |
| 170 | Valley Center Shoe City | 9616 Reisterstown Road | Owings Mills | MD | 21117 | 6,787 |
| 177 | Erdman Shoe City | 3943 Erdman Avenue | Baltimore | MD | 21213 | 5,200 |
| 230 | Laurel Shopping Center Shoe City | 357 Montrose Avenue | Laurel | MD | 20707 | 6,630 |
| 240 | Prince Georges Plaza Shoe City | 3500 East-West Highway | Hyattsville | MD | 20902 | 9,905 |
| 250 | Enterprise Plaza Shoe City | 9321 Annaplis Road #1010 | Lanham | MD | 20706 | 6,500 |
| 260 | Wheaton Plaza Shoe City | 11160 Veirs Mill Road #167 | Wheaton | MD | 20902 | 5,962 |
| 265 | Ellsworth Place Shoe City | 8661 Colesville Road | Silver Spring | MD | 20910 | 4,872 |
| 271 | Largo Town Center Shoe City | 930 Largo Center Drive | Upper Marlboro | MD | 20774 | 5,175 |
| 280 | Iverson Mall Shoe City | 3737 Branch Avenue | Temple Hills | MD | 20748 | 6,279 |
| 281 | Eastover Shoe City | Eastover Shopping Center | Oxon Hill | MD | 20745 | 8,250 |
| 282 | H Street Shoe City | 717 H Street, NE | Washington | DC | 20002 | 5,789 |
| 283 | Alabama Shoe City | 2851 Alabama Avenue, SE | Washington | DC | 20020 | 3,553 |
| 284 | King's Highway Shoe City | 7001 Martin Luther King Jr. Highway | Hyattsville | MD | 20785 | 6,300 |
| 285 | Rhode Island Shoe City | 1060 Brentwood Road, NE | Washington | DC | 20018 | 3,750 |
| 286 | Benning Shoe City | 3935A Minnesota Avenue, NE | Washington | DC | 20019 | 8,600 |
| 290 | Forestville Shoe City | 3393 Donnel Drive Suite C | Forestville | MD | 20747 | 5,288 |
| 295 | Brandywine Shoe City | 1590F Crain Highway, SE | Brandywine | MD | 20613 | 5,000 |
| 301 | Chesterfield Town Center Shoe City | 11500 Midlothian Turnpike #700 | Richmond | VA | 23225 | 5,288 |
| 322 | Southside Plaza Shoe City | 4740 N. Southside Plaza | Richmond | VA | 23224 | 8,750 |
| 327 | White Oak Village Shoe City | 4501 S Laburnum Avenue #445 | Richmond | VA | 23223 | 5,045 |
| 329 | New Oak Hill Shoe City | 3091 Mechanicsville Turnpike | Richmond | VA | 23223 | 6,720 |
| 330 | Southpark Mall Shoe City | 74 South Park Circle | Colonial Heights | VA | 23834 | 5,601 |
| 401 | JANAF Shopping Yard Shoe City | 5802 E Virginia Beach Boulevard #118 | Norfolk | VA | 23502 | 6,197 |
| 402 | Victory Crossing Shoe City | 4020 Victory Boulevard | Portsmouth | VA | 23701 | 6,000 |
| 403 | Coliseum Shoe City | 34 Coliseum Crossing | Hampton | VA | 23666 | 5,000 |

38

## **SCHEDULE 2**

**Sale Guidelines**

## Sale Guidelines[1]

1.     The Sale shall be conducted so that the Stores in which sales are to occur will remain open no longer than during the normal hours of operation provided for in the respective underlying store leases for the Stores.

2.     The Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no sales shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

3.     On "shopping center" property, Consultant shall not distribute handbills, leaflets or other written materials to customers outside of any Stores' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Store is located; *provided* that Consultant may solicit customers in the Stores themselves. On "shopping center" property, Consultant shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.     At the conclusion of the Sale, Consultant shall vacate the Stores in broom clean condition; *provided* that Consultant may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking) (collectively, "**FF&E**") not sold in the Sale at the conclusion of the Sale, without cost or liability of any kind to Consultant. Any abandoned FF&E left in a Store after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant. For the avoidance of doubt, as of the Sale Termination Date or vacate date, as applicable, Consultant may abandon, in place and without further responsibility or liability of any kind, any FF&E.

5.     Consultant may advertise the Sale as a "store closing", "sale on everything", "everything must go", "everything on sale" or similar-themed sale; *provided*, that following entry of any Approval Order, Consultant may thereafter utilize a "going out of business" sale theme. All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Merchant in accordance the Consulting Agreement.

6.     Consultant shall be permitted to utilize display, hanging signs, and interior banners in connection with the Sale; *provided* that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner. The Merchant and Consultant shall not use neon or day-glo on its display, hanging signs, or interior banners. Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines. In addition, the Merchant and Consultant shall be permitted to utilize exterior banners at (i) non-enclosed mall Stores and (ii) enclosed mall Stores to the extent the entrance to the applicable Store does not require entry into the enclosed mall common area; *provided, howeve*r, that such banners shall be located or hung so as to make clear that the Sale are being conducted only at the affected Store, shall not be wider than the storefront of the Store, and shall not be larger than 4 feet x 40 feet. In addition, the Merchant and Consultant shall be permitted to utilize sign walkers and A-frames in a safe and professional manner and in accordance

---

[1]     Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Store Closing Consulting Agreement. The term "Consultant" as used herein refers to the Store Closing Consultant and references to the "Consulting Agreement" refer to the Store Closing Consultant Agreement.

with the terms of the Approval Order (as defined in the Consulting Agreement). Nothing contained in these Sale Guidelines shall be construed to create or impose upon Consultant any additional restrictions not contained in the applicable lease agreement.

7.      Conspicuous signs shall be posted in the cash register areas of each of the affected Stores to effect that "all sales are final."

8.      Except with respect to the hanging of exterior banners, Consultant shall not make any alterations to the storefront or exterior walls of any Stores.

9.      Consultant shall not make any alterations to interior or exterior Store lighting. No property of the landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or in-Store signage and banners shall not constitute an alteration to a Store.

10.     Consultant shall keep Store premises and surrounding areas clear and orderly consistent with present practices.

11.     Subject to the provisions of the Agreement, Consultant shall have the right to sell all Owned FF&E, approved by the Merchant. Consultant may advertise the sale of the Owned FF&E in a manner consistent with these guidelines. The purchasers of any Owned FF&E sold during the sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through the front door of a Store during business hours provided such item may be carried out by one person in a shopping bag or cart, other areas after applicable business hours. For the avoidance of doubt, as of the Sale Termination Date or the Vacate Date, as applicable, Consultant may abandon, in place and without further responsibility, any FF&E.

12.     The Consultant shall be entitled to include Additional Consultant Goods in the Sale in accordance with the terms of the Consulting Agreement.

13.     At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, Consultant and their agents and representatives shall continue to have access to the Stores as provided for in the Agreement.

14.     The rights of landlords against Merchant for any damages to a Store shall be reserved in accordance with the provisions of the applicable lease.

15.     If and to the extent that the landlord of any Store affected hereby contends that Consultant or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant and Consultant as follows:

        <u>If to Consultant</u>:

        Gordon Brothers Retail Partners, LLC
        Prudential Tower
        800 Boylston Street
        Boston, MA 02119
        Attn:   David Braun, Counsel
        Email:  dbraun@gordonbrothers.com

With a copy to (which shall not constitute notice):

RIEMER & BRAUNSTEIN LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn: Steven E. Fox
Email: sfox@riemerlaw.com

If to Merchant:

ESCO, Ltd.
c/o Stanley W. Mastil, CPA, CFF
1007 Orange St., 4th Floor, Suite 461
Wilmington, DE 19801
Email: stanley.mastil@gavinsolmonese.com

With a copy to (which shall not constitute notice):

POLSINELLI PC
222 Delaware Ave., Suite 1101
Wilmington, DE 19801
Attn: Christopher A. Ward
Email: cward@polsinelli.com

3